IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BETTY FRYE, an individual; and TODD DUTY, an individual, | No. 79318-7-I |
| Appellants, | DIVISION ONE |
| v. | |
| JDH INVESTMENT GROUP LLC, a Nevada LLC;  THOMAS J. DOWNIE, individually and on behalf of his marital community; | UNPUBLISHED OPINION |
| Respondents, | |
| BLAKE HADDOCK, individually and on behalf of his marital community; and RANDALL JACKSON, individually and on behalf of his marital community, | |
| Defendants. | |

CHUN, J. — This case regards a dispute over promissory notes as well as tort and contract claims concerning real estate.  Betty Frye and Todd Duty [1] sued JDH Investment Group, LLC, and Thomas Downie (respondents).  Frye claimed fraud, obtaining money or property under false pretenses, elder abuse, intentional infliction of emotional distress, legal malpractice, civil conspiracy, violations of the Washington Consumer Protection Act, negligent

---

[1] While both Frye and Duty sued the respondents, Frye appears to have been the primary party to the suit and transaction.  Accordingly, below, we refer to the appellants as "Frye."

Citations and pin cites are based on the Westlaw online version of the cited material.

misrepresentation, and breach of contract. Frye also filed a lis pendens. JDH and Downie counterclaimed for tortious interference with a business expectancy. JDH also counterclaimed for breach of contract, breach of the implied duty of good faith, and slander of title, and requested damages and release of the lis pendens.

After a bench trial, the trial court dismissed Frye's claims and ruled in favor of JDH and Downie on their counterclaims. Frye appeals. For the reasons discussed herein, we affirm.

## I. BACKGROUND

### A. Facts

Frye sold undeveloped property in Auburn (Auburn property) to JDH for $3 million on June 14, 2013. As a part of the sale, Frye received $2 million in cash and two promissory notes (Auburn notes)—each for $500,000 and secured by the Auburn property. One of the Auburn notes would mature on December 14, 2013, and the other would mature on June 14, 2014. JDH is the obligor on the Auburn notes. The Auburn notes state that they bear five percent interest per annum "until paid," with six percent late charges. As a part of the transaction, one of JDH's members, Sue Jones, personally extended the $2 million that went to Frye, treating the funds as a loan to JDH with the Auburn property as collateral.

Also on June 14, 2013, Frye loaned $1.55 million to Northshore Montessori, Inc., a daycare business run by Downie, who was also a founding

2

member of JDH.[2] Downie's attorney, Randall Jackson, prepared the promissory note from the daycare (Daycare note).[3] Jackson claims that neither Frye requested nor Downie offered a personal guarantee. After Downie signed the note as Northshore Montessori's president, but before delivering it to Frye, Jackson noticed language stating that Downie personally guarantees the Daycare note. Jackson crossed out the language and then gave the note to Frye. Jackson claimed that he used a template to draft the Daycare note and that he mistakenly included personal guarantee language that he used in a prior transaction.

Between October and November of 2014, Frye also personally loaned $85,000 to Downie through two notes.

On February 8, 2017, JDH received preliminary plat approval for the Auburn property. By this time, the Auburn notes were several years overdue. Downie, by then the sole member of JDH, attempted to refinance the loans on the property with Pyatt Broadmark Management, LLC. Pyatt placed $5.8 million in escrow in anticipation of the refinancing. As part of the closing process, the escrow company needed a payoff quote from Frye indicating the amount due under the Auburn notes and a release of her deeds of trust. In May 2017, Downie and Jackson approached Frye on behalf of JDH and tendered $1.2 million—$500,000 for each note, plus five percent interest—in exchange for her release of the Auburn notes. But Frye argued the 12 percent statutory interest

_____

[2] Downie was once married to Frye's daughter. At the time of the transaction, the couple were divorced but had reconciled.

[3] Jackson also acted as JDH's manager.

rate applied to the Auburn notes since they were post-maturity, and demanded $1.5 million. Frye increased her demand to $1.6 million, then $1.7 million, stating she could charge whatever she wanted, since the refinancing depended on her releasing the Auburn notes. JDH, bewildered by Frye's demands, refused to pay more than $1.2 million. When it became apparent to Pyatt that the parties had deadlocked, it withdrew its refinancing offer.

On June 14, 2017, JDH received a letter of intent to purchase the Auburn property from Toll Brothers, who proposed a purchase price of $7.8 million.

B. Procedural History

On August 23, 2017, Frye filed a lis pendens referencing the Auburn property and an associated complaint.

The next day, Frye sued JDH and Downie.[4] Frye's suit claimed: against Downie, elder abuse, intentional infliction of emotional distress, and breach of contract for nonpayment on the personal loans and the Daycare note; and against all defendants, civil conspiracy, fraud, false pretenses, violations of the Washington Consumer Protection Act, and negligent misrepresentation. Frye pleaded for damages, injunctive relief to prevent sale of the Auburn property or use of it as collateral, rescission of the deeds and return of the property, interest, and attorney fees.

JDH and Downie counterclaimed for tortious interference with a business

---

[4] Frye also named Blake Haddock, an original member of JDH who helped facilitate the sale of the Auburn property, as a defendant. Frye additionally named Jackson. The trial court dismissed the claims against Haddock and Jackson; Frye does not assign error to such dismissal.

expectancy; JDH counterclaimed for breach of contract, breach of the implied duty of good faith, slander of title, unjust enrichment, and also requested damages, a declaratory judgment on the amounts owed on the Auburn notes, and release of the lis pendens.

The matter proceeded to a bench trial. During closing argument, Downie conceded that he owed $85,000 on the personal notes to Frye, plus 12 percent interest.

On November 5, 2018, the trial court dismissed Frye's claims and ruled in favor of JDH and Downie on their tortious interference counterclaim, and in favor of JDH on their breach of contract, breach of implied duty of good faith, and slander of title counterclaims. The trial court also declared that JDH owed $1.2 million on the Auburn notes, since they bore five percent interest even after maturity and the late fees provision on the notes was unenforceable. The trial court also found that Downie did not personally guarantee the Daycare note, and since Northshore Montessori was not a party to the action, dismissed Frye's claim to recover under the Daycare note. Finally, the trial court awarded JDH and Downie attorney fees. After subtracting the damages from the counterclaims and attorney fees from the amounts owed on the Auburn notes, the trial court concluded that JDH owed $646,908 to Frye. After subtracting damages and attorney fees from the amounts owed on his personal notes to Frye, the trial court concluded that Downie owed Frye $12,801. Frye appeals.

## II. ANALYSIS

When reviewing a trial court's findings of fact and conclusions of law, we limit review to whether substantial evidence supports the findings of fact and whether the findings of fact support the conclusions of law. Douglas v. Visser, 173 Wn. App. 823, 829, 295 P.3d 800 (2013). "Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the declared premise." Douglas, 173 Wn. App. at 829. Additionally, we defer to a trial court's determinations of the weight and credibility of the evidence. Mueller v. Wells, 185 Wn.2d 1, 9, 367 P.3d 580 (2016).

RAP 10.3(g) requires appellants to make specific assignments of error to the trial court's findings of fact, with reference to the finding by number. We "will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto." RAP 10.3(g). "RAP 10.3 requires an appellant to present argument to the reviewing court as to why specific findings of fact are in error and to support those arguments with citation to relevant portions of the record." In re Disciplinary Proceeding Against Burtch, 162 Wn.2d 873, 895, 175 P.3d 1070 (2008). Where an appellant "fail[s] to pinpoint any argument as to why specific findings of fact are not supported by substantial evidence . . . [,] [we need not] unearth arguments from the record for the benefit of an appellant." Burtch, 162 Wn.2d at 896. "Assignments of error not argued or further referred to in a brief are treated as abandoned." In re Estate of Wimberley, 186 Wn. App. 475, 503, 349 P.3d 11 (2015). Unchallenged findings of fact are verities on appeal. Mueller, 185 Wn.2d at 9.

Frye assigns error specifically to six of the trial court's findings of fact—69, and 76 through 80—and three of its conclusions of law—66, 67, and 85. Frye assigns error generally to the remaining findings of fact and conclusions of law in her assignments of error. Throughout the argument section of her brief, Frye makes additional assignments of error to the trial court's conclusions of law and findings of fact. We treat those findings of fact not specifically identified by Frye in her assignment of error or argument section as verities.

A. Amounts Owed on Notes to Frye

Frye argues that the trial court improperly calculated the amounts owed on the Auburn notes. First, she asserts that the trial court mistakenly concluded that a five percent interest rate applies to the matured notes, instead of the statutory twelve percent rate; she contends the parties did not agree on a post-maturity interest rate. Second, she argues that the trial court erroneously concluded that the six percent late charges for missed balloon payments in the Auburn notes constitute an unenforceable penalty. Third, she argues that, if a 12 percent interest rate applied to the notes post-maturity or late charges applied, then the trial court improperly determined that JDH's $1.2 million tender stopped interest from accruing on the Auburn notes. JDH disagrees. We conclude that a five percent interest rate applied to the Auburn notes post-maturity, that the six percent late charges constituted unenforceable penalties, and that the $1.2 million tender stopped interest from accruing on the notes.

1.  Post-Maturity Interest Rate

The trial court concluded that, because the Auburn notes state that they bear five percent interest "until paid," and nothing in RCW 19.52.010 suggests that parties must agree to a separate post-maturity rate, the Auburn notes bore five percent interest even after default. RCW 19.52.010(1) provides a statutory interest rate of 12 percent. Frye argues that this rate applies to the Auburn notes, because the fact that the Auburn notes state that they bear five percent interest "until paid" means that they bear five percent interest until maturity, and then the statutory rate thereafter.

We review de novo questions of contract interpretation that do not depend on extrinsic evidence and statutory interpretation. 4518 S. 256th, LLC v. Karen L. Gibbon, P.S., 195 Wn. App. 423, 435, 382 P.3d 1 (2016). "The purpose of contract interpretation is to determine the parties' intent." Roats v. Blakely Island Maint. Comm'n, Inc., 169 Wn. App. 263, 274, 279 P.3d 943 (2012). Washington courts focus on the agreement's objective manifestations to ascertain the parties' intent. Martin v. Smith, 192 Wn. App. 527, 532, 368 P.3d 227 (2016). Martin explains this approach further:

> We impute an intention corresponding to the reasonable meaning of the words used. The parties' subjective intent is irrelevant if we can ascertain their intent from the words in the agreement.
>
> We give words their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent. We interpret only what was written in the agreement, not what the parties intended to write. Additionally, a contract provision is not ambiguous merely because the parties to the contract suggest opposing meanings. We will not read ambiguity into a contract where it can reasonably be avoided.

192 Wn. App. at 532–33 (internal quotation marks and citations omitted). In light of these principles, we conclude that the Auburn notes' "until paid" language means that they bore five percent interest even after maturity.

RCW 19.52.010 provides that "every loan or forbearance of money, goods, or thing in action shall bear interest at the rate of twelve percent per annum where no different rate is agreed to in writing between the parties." "When a party beaches an obligation to pay a liquidated debt, a new forbearance is created." TJ Landco, LLC v. Harley C. Douglass, Inc., 186 Wn. App. 249, 256, 346 P.3d 777 (2015).

Frye argues that JDH's failure to pay the Auburn notes on time constituted a forbearance, and that after the forbearance, the statutory interest rate applies. Frye cites a decision from the federal bankruptcy court in the Western District of Pennsylvania in support of her argument that the "until paid" rate applies up to the maturity of the notes, and then the statutory rate applies. See In re Dilts, 143 B.R. 644, 646 (Bankr. W.D. Pa. 1992) ("In the absence of an express agreement to the contrary, the legal rate of interest applies from the date of maturity irrespective of the rate prescribed in the instrument for the period prior to maturity."). Citing Palmer v. Labree, 23 Wn. 409, 420–21, 63 P. 216 (1900), which in turn cites a decision from 1842—Ludwick v. Huntzinger, 1842 WL 4909 (Pa. 1842)—Frye says that Washington has "long aligned itself with Pennsylvania law on this point." But we decline this invitation to follow non-Washington authority.

9

Over a century ago, in Bank v. Doherty—which remains good law—our Supreme Court interpreted a note that provided an interest rate of two percent and listed no rate after maturity. 42 Wn. 317, 328, 84 P. 872 (1906). The Supreme Court declared that the statutory rate applied after maturity, and said that "[i]f the parties had intended the note in question to draw interest at the rate of [two percent] per month after maturity, it would have been an easy matter to have placed such an intention beyond doubt by simply adding the words '*until paid*' after the words [two percent] per month." Bank, 42 Wn. at 330 (emphasis added).

Around five years ago, in TJ Landco, the Court of Appeals favorably cited Bank for the proposition that "[o]ur cases have long distinguished between agreements to pay interest at maturity and agreements to pay interest 'until paid.'" 186 Wn. App. at 258. TJ Landco interprets the terms "until paid" in RCW 4.56.110—a statute governing post-judgment interest—and in the parties' contracts. 186 Wn. App. at 258. Because the parties' contract modification did not include "until paid" language, the court determined that the statutory interest rate applied after default. 186 Wn. App. at 260. RCW 4.56.110 specifically states that "[j]udgments founded on written contracts, providing for the payment of interest *until paid* at a specified rate, shall bear interest at the rate specified in the contracts." (Emphasis added.) RCW 19.52.010 does not include similar "until paid" language. However, it is telling that TJ Landco cites Bank—not a case about post-judgment interest—for an interpretation of the "until paid" language, and states that "until paid" is a term of art. TJ Landco, 186 Wn. App.

10

at 258. Thus, the trial court properly concluded that parties intended "until paid" in the note to mean that the five percent rate applies even after default.

Frye also points to certain text messages she sent Downie, wherein she stated a 12 percent interest rate applies after default, to support an argument that the parties intended for the statutory rate to apply after default. But a court may not consider evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term. Pitell v. King County Pub. Hosp. Dist. No. 2, 4 Wn. App. 2d 764, 774, 423 P.3d 900 (2018).

Frye also invokes the last antecedent rule. The Auburn notes state that "[JDH] promises to pay to [Frye] or order, at [address] the sum of [$500,000], with interest from June 14, 2013 until paid, at the rate of 5.00% per cent, per annum, shall be due and payable on [due date]." Frye argues that "a comma before the qualifying phrase 'shall be due and payable on [due date]' means the parties intended this maturity date qualifying phrase to apply to all prior antecedents including the antecedent with the 'until paid' phrase." In effect, she argues that the five percent interest rate only applies until the due date. Under the last antecedent rule, "the presence of a comma before the qualifying phrase is evidence the qualifier is intended to apply to all antecedents instead of only the immediately preceding one." City of Spokane v. County of Spokane, 158 Wn.2d 661, 673, 146 P.3d 893 (2006). As the provision in question defies meaningful application of the last antecedent rule, Frye's argument fails.

We conclude that the trial court properly determined the Auburn notes bore five percent interest even after maturity.

11

2. Late Charge Enforceability

Frye argues that the trial court erred in concluding that the six percent late charge on the Auburn notes constitute unenforceable penalties. The respondents disagree. We conclude that the trial court did not err on this issue.

The Auburn notes each provide, "In the event any payment is not paid within 10 days of the due date, [JDH] shall pay to [Frye] a LATE CHARGE of 6.00% of the payment due in addition to each payment due and unpaid." The trial court treated these late charge provisions as liquidated damages clauses, and Frye does not argue the trial court improperly did so.

Washington courts will typically uphold a liquidated damages provision unless it constitutes a penalty or is otherwise unlawful. Wallace Real Estate Inv., Inc. v. Groves, 124 Wn.2d 881, 886, 881 P.2d 1010 (1994). The party asserting a right to liquidated damages need not prove actual damages. Wallace, 124 Wn.2d at 892. However, the "amount fixed [as liquidated damages] must be a reasonable forecast of just compensation for the harm that is caused by the breach." Walter Implement, Inc., v. Focht, 107 Wn.2d 553, 559, 730 P.2d 1340 (1987). "[L]iquidated damages agreements fairly and understandingly entered into by experienced, equal parties *with a view to just compensation for the anticipated loss* should be enforced." Wallace, 124 Wn.2d at 886 (emphasis added). "Determination of whether the test is met depends on the facts and circumstances of each case." Walter Implement, 107 Wn.2d at 559.

Frye argues that JDH is a sophisticated party that has entered into other contracts with high interest late fee provisions in support of her argument that the

12

six percent late charges are reasonable. But even where the parties to such an agreement are sophisticated, we must nevertheless analyze whether the liquidated sum acts as a reasonable pre-estimate of loss. See Wallace, 124 Wn.2d at 894–97 (conducting such a review of reasonableness even where the parties were sophisticated). The late charge provisions do not purport to compensate Frye for the harm from late payment. No evidence in the record suggests that the parties intended that the late charge provisions estimate Frye's losses in the event of late payment. The late charge provisions thus constitute unenforceable penalties.

Frye argues in her reply that the late charges estimate her collection costs and lost opportunity from larger profits. Typically, we will not consider arguments raised for the first time in a reply brief, since the respondent has no meaningful opportunity to respond. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). Additionally, her argument amounts to a post-hoc rationalization for enforcing the late charge provision; before and during trial, Frye indicated that she understood the late charge provision not as a late charge provision, but as an adjustment of the interest rate after default. "Courts will look to the intention of the parties to make an accurate assessment of the clause's purpose." Walter Implement, 107 Wn.2d at 559. Frye's prior purported understanding of the late charge clause does not accord with the proposition that the parties intended it to be a reasonable forecast of her losses in the event of late payment. The trial court properly determined the late charge provisions on the Auburn notes constitute unenforceable penalties.

13

3. Effect of Tender on Accrual of Interest

"[T]ender of the amount due must be unconditional in order to stop interest from running.  Tender of less than the full amount due under the contract constitutes a conditional tender."  Jones v. Best, 134 Wn.2d 232, 243, 950 P.2d 1 (1998).  Thus, if JDH owed more than its $1.2 million tender, it was conditional, and would not have stopped interest from accruing on the notes.  Since we determine the Auburn notes continued to accrue only five percent interest after maturity, and the late charges constituted unenforceable penalties, the $1.2 million tender was for the correct amount due.  Thus, the trial court properly determined that the tender was not conditional and it stopped interest from accruing on the notes.  See RCW 62A.3-603(c) ("If tender of payment of an amount due on an instrument is made . . . the obligation of the obligor to pay interest after the due date on the amount tendered is discharged.").

B. Downie Guarantee of the Daycare Note

Frye argues the trial court erred in finding that Downie did not personally guarantee the Daycare note.  The respondents argue the trial court's finding on this subject is supported by substantial evidence.  We agree with the respondents.

"A scrivener's error occurs when the intention of the parties is identical at the time of the transaction but the written agreement errs in expressing that intention."  Glepco, LLC v. Reinstra, 175 Wn. App. 545, 561, 307 P.3d 744 (2013).  A scrivener's error must be established by clear, cogent, and convincing evidence.  Glepco, 175 Wn. App. at 560–61.  "Clear, cogent, and convincing

evidence exists when the ultimate fact in issue is shown by the evidence to be highly probable." In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks and citation omitted). We determine the intent of the parties "by viewing the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." Glepco, 175 Wn. App. at 561. Additionally, we may affirm the trial court on any basis supported by the record. Larson v. State, 9 Wn. App. 2d 730, 744, 447 P.3d 168 (2019).

The copy of the Daycare note in the record signed June 14, 2013, designated as Exhibit 22, states that Downie personally guarantees the Daycare note. For the following reasons, this constituted a scrivener's error.

Jackson, who drafted the Daycare note, testified as follows: The Daycare note contained Downie's personal guarantee because he used a template from a previous transaction and neglected to delete the personal guarantee language. According to Jackson, Frye did not request a personal guarantee, and Downie did not offer a guarantee. Jackson testified that on June 17, 2013, he went to the bank with Frye to wire money out from her account. While at the bank, Jackson was reviewing the documents he had brought, and noticed the personal guarantee language on the Daycare note. Since the language was mistakenly included, he crossed off the guarantee. Jackson pointed out the correction to Frye, and offered to have Downie execute a new note. Frye indicated that she

did not want Downie to execute a new copy.[5]  Jackson gave Frye the Daycare note.

Downie also testified that he did not personally guarantee the note.  He said Frye did not request a personal guarantee, and he did not offer her a guarantee.  Frye testified that she lost her original version of the note.

Based on the foregoing testimonial evidence, the trial court found that Downie did not personally guarantee the Daycare note.  We need not weigh Frye's statements to the contrary, since the trial court found that Frye was not credible on any issue in dispute.  The trial court also found that, standing alone, Downie's testimony was not reliable, but that it was credible, since "transaction documents, written communications, and the testimony of every non-party witness" corroborated it.[6]  The trial court also found that Jackson was credible and reliable on every issue in dispute.  We defer to a trial court's determinations as to the weight and credibility of the evidence.  Mueller, 185 Wn.2d at 9.  Since the factual dispute of whether Downie personally guaranteed the note depends on the weight and credibility of Downie, Frye, and Jackson's testimony, we conclude that it is highly probable that the inclusion of the personal guarantee

---

[5] Frye argues that Downie's testimony about the personal guarantee conflicts with Jackson's, and that Downie understood that he personally guaranteed the Daycare note.  But Downie unequivocally stated that he did not personally guarantee the note, and that it was his understanding—as a non-lawyer—that Northshore Montessori "personally guaranteed" the note, and that he signed on Northshore Montessori's behalf.

[6] Eight non-party witnesses testified during trial.

language constituted scrivener's error. Thus, the trial court properly found Downie did not guarantee the Daycare note.[7]

C. JDH and Downie's Counterclaims

Frye argues the trial court erred by ruling in JDH and Downie's favor on their counterclaims. She argues that: (1) she had no contractual obligation to accept JDH's offer of tender; (2) the trial court erroneously concluded that her complaint and lis pendens constituted slander of title; and (3) the trial court erred in concluding that she is liable to JDH and Downie for tortious interference with a business expectancy. JDH and Downie disagree. We conclude that the trial court properly ruled on these counterclaims.

1. JDH's Breach of Contract Claim

Frye argues she had no contractual obligation to accept JDH's tender offer. We disagree.

First, the Auburn notes require that, "when paid, this note and the Deed of Trust must be surrendered to the trustee with request for reconveyance." Next, every contract contains an implied duty of good faith and fair dealing. Badgett v. Security State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This duty does

---

[7] Exhibit 22 is a version of the Daycare note without the personal guarantee language crossed out. Frye argues that, since the respondents did not object in limine to Exhibit 22's authenticity, they cannot later claim that Exhibit 22 did not represent the final version of the note. But admission of evidence "does not restrict the trier of fact's authority to determine the weight of the evidence after hearing all of the evidence and the arguments of opposing parties." ER 904(d). Here, the trial court weighed the copy of the Daycare note in the record against Downie's, Frye's, and Jackson's testimony, and concluded that Exhibit 22 did not represent the parties' full agreement. Further, the respondents do not argue that the exhibit should not have been admitted; but instead that the note was altered after Downie signed it but before it was delivered to Frye, so the exhibit does not represent the agreement of the parties.

not oblige a party to accept a material change in the contract, but does require the parties to perform in good faith the obligations imposed by their agreement. Badgett, 116 Wn.2d at 569. Frye argues she had no obligation to accept a reduced payoff amount for the Auburn notes; but as discussed above, JDH's $1.2 million tender was for the correct amount due. Because Frye refused the tender, demanded amounts in excess of $1.2 million, and asserted that she could charge whatever she wanted, since the refinancing depended on her release of the Auburn notes, the trial court properly determined that Frye violated her obligations under the notes and the implied covenant of good faith.[8]

### 2. JDH's Slander of Title Claim

Frye argues the trial court erroneously concluded her complaint and lis pendens constituted slander of title. We disagree.

Slander of title is: "(1) false words; (2) maliciously published; (3) with reference to some pending sale or purchase of property; (4) which go to defeat plaintiff's title; and (5) [resulting in] pecuniary loss." Centurion Prop. III, LLC v. Chicago Title Ins. Co., 186 Wn.2d 58, 80-81, 375 P.3d 651 (2016). We address these elements in turn.

---

[8] Frye also argues that JDH could have paid "under protest" the full amount she demanded, and then sued to recover the alleged overcharges, as in Rodgers v. Rainier Nat'l Bank, 111 Wn.2d 232, 757 P.2d 976 (1988). But as noted by the respondents, Frye did not raise this argument below, and accordingly, we need not consider it. RAP 2.5(a). Additionally, Frye points to no authority that suggests JDH *must* have paid under protest in these circumstances.

a.  False words

We agree with the trial court's conclusion that the plaintiffs included false allegations in their complaint.

On August 23, 2017, Frye filed a lis pendens referencing the Auburn property, which states that the "[p]laintiffs have superior right, title and interest to all defendants in a portion of the [Auburn property] under claims as specified in the Complaint."  "[T]he Complaint" is a reference to the complaint filed by Frye on August 24, 2017, wherein she alleged fraud and that she passed title to the defendants under false pretenses, and requested rescission of the deeds and return of the Auburn property.

As a part of the fraud and false pretenses claims in the complaint, Frye contended that Downie misrepresented his involvement in JDH.  The trial court determined that Frye had failed to satisfy her burden of proof on the elements of the claims.  From such, the trial court concluded that she made false allegations in the complaint, including "the allegation that [Frye] had been deceived in a manner that would justify rescinding the sale of the property that had occurred in 2013."  Frye does not assign error to the trial court's finding that she knew of Downie's involvement in JDH "from the beginning"; this unassigned factual finding is a verity on appeal.  Since the facts are to the contrary of Frye's assertion that Downie misrepresented his involvement in JDH, the complaint contained false words.

19

b. Maliciously published

Frye argues JDH did not prove malice, but does not argue that the trial court improperly concluded that the filing of the complaint and recording of the lis pendens constituted "publishing."[9]

The trial court properly concluded that Frye published the complaint and lis pendens with malice. In determining as such, the trial court made the following unchallenged findings of fact: After the parties came to a disagreement about the amount owed on the Auburn notes, Frye changed her demand first from $1.5 to $1.6, then to $1.7 million, "saying that she could demand whatever she wanted because JDH needed her payoff to close its refinance"; JDH refused to pay these additional amounts; and shortly thereafter, Frye filed her complaint and lis pendens. "The element of malice is met when the slanderous statement is not made in good faith or is not prompted by a reasonable belief in its veracity." Rorvig v. Douglas, 123 Wn.2d 854, 860, 873 P.2d 492 (1994). That Frye filed her complaint and lis pendens shortly after JDH refused to pay her more than was owed on the notes supports the trial court's conclusion that Frye made false allegations maliciously, and in bad faith, to extort money in excess of the amount actually owed on the notes.

---

[9] Frye argues that the trial court erred in reaching Conclusion of Law 90, wherein the trial court determined that the filing of the complaint and recording of lis pendens constituted publishing. However, Frye did so as a part of her argument regarding privilege—addressed below—and not as a part of her argument regarding malicious publishing.

c. Reference to some pending sale or purchase of property

The pending sale element requires more than a mere expectation that negotiations about a sale might begin; actual negotiations or offers suffice. Rorvig, 123 Wn.2d at 860 (citing Clarkston Com'ty Corp. v. Asotin County Port Dist., 3 Wn. App. 1, 472 P.2d 558 (1970)). Frye argues no sale was pending at the time the complaint and lis pendens were filed, but JDH had received a letter of intent from Toll Brothers to purchase the Auburn property on or before November 1, 2017 by this time.

d. Defeating plaintiff's title

The complaint and lis pendens go to defeat JDH's title insofar as they allege Frye has a right to rescission of the contract transferring them the property. The lis pendens unequivocally clouded JDH's title to the property. See, e.g., RCW 4.28.328(1)(a) ("'Lis pendens' means a lis pendens . . . or other instrument having the effect of clouding title to real property."). The trial court properly concluded that JDH established this element.

e. Pecuniary loss

Frye does not contest the trial court's conclusion that JDH and Downie suffered pecuniary loss as a result of her wrongful conduct, or the underlying factual findings supporting it. Thus, we uphold the trial court's determination as to this element.

f. Privilege defense

Frye argues that JDH's slander of title counterclaim fails because the lis pendens and complaint were absolutely privileged. See McNeal v. Allen, 95

Wn.2d 265, 267, 621 P.2d 1285 (1980) ("Allegedly libelous statements, spoken or written by a party or counsel in the course of a judicial proceeding, are absolutely privileged if they are pertinent or material to the redress or relief sought, whether or not the statements are legally sufficient to obtain that relief."). Frye claimed privilege in her Reply and Affirmative Defenses to the Respondents' Counterclaims, but not with argument or citation to legal authority. Thus, Frye raises this argument for the first time on appeal and we decline to consider it.[10] See RAP 2.5.

The trial court properly determined that Frye is liable for slander of title.

3. JDH and Downie's Tortious Interference Claim

The trial court determined Frye was liable for tortious interference with a business expectancy due to her interference with JDH and Downie's efforts to

---

[10] But even if considered, under RCW 4.28.328(3), "[u]nless a claimant establishes a substantial justification for filing the lis pendens, a claimant is liable to an aggrieved party who prevails in defense of the action in which the lis pendens was filed for actual damages," as well as reasonable attorney fees and costs.

Additionally, in Centurion, our Supreme Court, in concluding that the tort of slander of title requires malicious conduct and not mere negligence, stated that "if simple negligence were the rule, a party claiming an erroneous but good faith interest in real property would not be entitled to litigate [their] claim and have an adjudication without fear of being penalized in damages." 186 Wn.2d at 81. This statement suggests good faith lis pendens filings are sufficiently protected by the tort's malice element, without need for an absolute privilege. See also 50 AM. JUR. 2d § 520 ("The filing of a lis pendens notice, however, is not a privileged act and can form the basis for a slander of title claim where the filing is instituted for a purpose other than securing adjudication of a plaintiff's claim and is without reasonable belief in a valid claim, or in other words, is an improper filing.").

While the trial court did not make a ruling on privilege—perhaps because Frye did not adequately argue the issue—it did, in granting JDH's claim for attorney fees associated with slander of title, conclude that Frye's demand for default interest lacked any justification, and that "Frye's testimony was so contrary to the evident facts . . . as to suggest bad faith." Further, as discussed above, the trial court properly concluded that Frye acted with malice.

refinance, and JDH's efforts to sell the Auburn property. We agree with the trial court.

> Tortious interference with a contract requires:
>
> (1) the existence of a valid business expectancy, (2) that the defendant had knowledge of that expectancy; (3) an intentional interference inducing or causing termination of the expectancy; (4) that the defendant interfered for an improper purpose or used improper means; and (5) resultant damage.

Greensun Group, LLC v. City of Bellevue, 7 Wn. App. 2d 754, 767–68, 436 P.3d 397 (2019) (internal ellipses, quotation marks and citation omitted). Finally, good faith may privilege an interferer's actions. Greensun, 7 Wn. App. 2d at 777. We address these elements in turn.

### a. Valid business expectancy

The trial court found that Toll Brothers sent JDH a letter of intent to purchase the Auburn property for $7,800,000. Frye argues no business expectancy existed as to Toll Brothers, because the letter of intent did not bind the parties to sale. Frye does not argue that no business expectancy existed as to the refinancing.

Courts require less than an enforceable contract to establish a business expectancy; a reasonable expectation of a prospective contractual relationship may suffice. Greensun, 7 Wn. App. 2d at 768–69. Although the letter of intent did not bind the parties to sale, it nevertheless created a reasonable expectation of a prospective contractual relationship sufficient to constitute a business expectancy. This unchallenged finding of fact supports the trial court's

23

conclusion that a valid business expectancy existed as to the refinancing and sale.

> b. Knowledge

Frye argues she did not know of the Toll Brothers' letter of intent, and that she was not informed the refinancing would fail unless a deal was reached. This element requires that Frye knew of "facts giving rise to the presence of the business expectancy." Greensun, 7 Wn. App. 2d at 771.

The trial court's findings establish that Frye knew of the refinancing. Frye need not have known of the possibility of the refinancing's failure, but only of the expectancy itself. The trial court found that Frye knew of the business expectancy of the sale.[11] While Downie and JDH did not specifically inform her of the Toll Brothers' letter of intent, Frye knew they were making efforts to sell the property after they obtained preliminary plat approval. Frye does not challenge the trial court's findings establishing that she had knowledge of the refinancing, and substantial evidence supports the trial court's finding that she had knowledge of the sale.

---

[11] The trial court apparently found that Frye knew of the sale in Conclusion of Law 57. "We treat mislabeled findings of fact or conclusions of law as what they actually are, and review them accordingly." State v. Conway, 8 Wn. App. 2d 538, 552 n.8, 438 P.3d 1235 (2019). "Findings of fact are determinations of whether evidence shows that something occurred or existed. Conclusions of law are determinations made by a process of legal reasoning from facts in evidence." Casterline v. Roberts, 168 Wn. App. 376, 382–83, 284 P.3d 743 (2012) (internal quotation marks, ellipses, and citations omitted). Further, the trial court stated that, "[t]o the extent the following Findings of Fact contain legal conclusions those shall be deemed Conclusions of Law, and to the extent the following Conclusions of Law contain factual findings, those shall be deemed Findings of Fact." Here, the trial court's conclusion that Frye knew of the sale more resembles a finding of fact; thus, we review it to determine if it is supported by substantial evidence.

c. Intentional interference

Frye argues she did not interfere with the refinancing or sale. "A party intentionally interferes with a business expectancy if it desires to bring it about or if [they] know that the interference is certain or substantially certain to occur as a result of [their] action." Greensun, 7 Wn. App. 2d at 772 (internal quotation marks and citation omitted). Analysis of this element does not consider good faith. Greensun, 7 Wn. App. 2d at 772.

Unchallenged findings of fact demonstrate that Frye insisted first on a $1.5 million payment for release of her notes, then $1.6, then $1.7 million; by doing so, Frye intentionally interfered with the refinancing. The trial court also found that Frye induced Jones to delay issuing a payoff quote.[12] This finding is supported by substantial evidence; Jackson claims that Frye asked Jones to delay her payoff quote until Frye "got what she wanted." Frye's attempts to induce Jones to delay issuing a payoff quote also constitute intentional interference with the refinancing.

By filing her complaint and lis pendens action, it was substantially certain that JDH's title to the Auburn property would be clouded and sale would be more difficult.[13] See, e.g., RCW 4.28.328(1)(a). Frye intentionally interfered with any sale by filing her complaint and lis pendens.

---

[12] "We treat mislabeled findings of fact or conclusions of law as what they actually are, and review them accordingly." Conway, 8 Wn. App. 2d at 552 n.8 The portion of this conclusion stating that Frye induced Jones to delay issuing a payoff quote constitutes a finding, not a conclusion.

[13] Frye assigns error to Finding of Fact 99, which states that the lis pendens acted as a "preliminary injunction" preventing sale and refinancing. But whether this is

The trial court's conclusion that Frye intentionally interfered with JDH and Downie's business expectancies is supported by unchallenged findings of fact, or by findings that are, in turn, supported by substantial evidence.

### d. Improper purpose or improper means

Frye argues she did not act with improper purpose or use improper means to prevent the refinancing or sale. A plaintiff establishes this element when the defendant acts with improper motive, improper means, or both. Greensun, 7 Wn. App. 2d at 773. The trial court ruled that Frye acted with an improper purpose, and used improper means to effectuate the improper purpose.

"Exercising one's legal interest in good faith is not improper interference." Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 168, 273 P.3d 965 (2012). But when a party acts with greed, hostility, or retaliation, they demonstrate an improper purpose. Elcon, 174 Wn.2d at 169. Frye claims she had a good faith basis for demanding $1.5 million on the Auburn notes. But even assuming as such, no good faith basis existed for demanding $1.6 million, then $1.7 million. The trial court's unchallenged findings of fact establish that Frye claimed she could demand whatever she wanted, since otherwise, JDH would not be able to refinance. Her demands and statement that she could ask for whatever she wanted reflect hostility as her purpose for interfering with the refinancing. Thus, the trial court's findings support its conclusion that she interfered with the refinancing for an improper purpose.

---

an accurate representation of the lis pendens' effect need not be resolved, since the lis pendens also interfered with the sale by clouding JDH's title to the Auburn property.

"To show improper means, the plaintiff must demonstrate the defendant had a duty not to interfere. To establish such a duty, the plaintiff may point to a statute, regulation, recognized common law, or established standard of trade or profession." Greensun, 7 Wn. App. 2d at 773. Under Washington law, every contract has an implied duty of good faith and fair dealing. Rekhter v. State, Dep't of Soc. and Health Serv., 180 Wn.2d 102, 112, 323 P.3d 1036 (2014). As discussed above, the trial court's unchallenged findings of fact support its conclusion that Frye maliciously published her complaint and lis pendens. By maliciously filing the complaint and lis pendens, Frye acted in bad faith and via improper means. The trial court's findings support its conclusion that Frye acted with improper means to cloud JDH's title to the Auburn property, effectively preventing its sale.

> e. Resultant damage

Frye argues that JDH failed to prove resultant damage, since the Toll Brothers' letter of intent cannot serve as a reasonable estimate of the Auburn property's value. Frye also argues the trial court erred in its determination of the refinancing damages. Claims of damages must be proved with reasonable certainty and supported by evidence sufficient to afford a reasonable basis for estimating loss. Greensun, 7 Wn. App. 2d at 776.

The trial court found that portions of the refinance monies were intended to go to Downie, and that he suffered $60,063 in damages as a result of the failure of the refinancing. These unchallenged findings of fact support the trial

court's conclusion that Downie suffered $60,063 as a result of Frye's tortious interference.[14]

The trial court found that JDH suffered $407,151 in additional carrying costs as a result of the failure of the refinance and sale. It is unclear exactly what portion of the carrying costs can be attributed to the failure of the refinance and what portion of these damages can be attributed to the failure of the sale of the Auburn property, but Frye does not meaningfully dispute the trial court's computation of damages.[15]

Additionally, the trial court found that JDH suffered $106,457 in loss of use of net proceeds as the result of the failure of the sale, and used the purchase price from the Toll Brothers' letter of intent to compute JDH's damages. Frye argues that this is an improper computation, since the sale to Toll Brothers was

---

[14] Frye argues that Downie did not have standing to assert tortious interference since, as the sole LLC member, he suffered no distinct injury separate from the LLC. See Woods View II, LLC v. Kitsap County, 188 Wn. App. 1, 22–24, 352 P.3d 807 (2015). Frye appears to have raised this argument below only during oral argument at the hearing on her motion for reconsideration. Based on the record, it is unclear what provision of law Frye referred to in making this argument. We need not consider issues an appellant failed to raise below. See State v. Burden, 104 Wn. App. 507, 515, 17 P.3d 1211 (2001) (determining the State waived an argument where it only, and obliquely, raised such argument during oral argument, and not in its briefing); RAP 2.5(a). In any event, JDH also asserted the tortious interference claim, so the $60,063 claimed by Downie would otherwise have gone to JDH, of which Downie is the sole member.

[15] Frye does not assign error to Finding of Fact 101. However, Frye argues that after its oral ruling, the trial court improperly allowed JDH and Downie to amend their claimed damages, and also erred by "denying [her] motion for reconsideration to correct mathematical errors made in their calculations." Frye does not offer legal authority in support of her proposition that this court should disregard the trial court's damages calculations, or in support of her claim that the trial court improperly allowed amendment of claimed damages. We need not consider arguments unsupported by legal authority. Cowiche Canyon Conservancy, 118 Wn.2d at 809; RAP 10.3(a)(5).

speculative, and the value listed in the letter of intent did not represent the fair market value of the Auburn property.

As to whether the sale to Toll Brothers was too speculative to support an award of damages, first, the question is not whether an actual sale would have happened, but whether Frye interfered with a reasonable business expectancy. As already addressed, she did so. Second, the respondents presented evidence that Frye's conduct prevented the sale.

As to the Auburn property's value, JDH need only prove its damages with reasonable certainty. See Greensun, 7 Wn. App. 2d at 776; see also Rorvig, 123 Wn.2d at 861 ("Evidence of damages is sufficient if it affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture."). "Fair market value is the amount a willing buyer would pay a seller who is willing but not obligated to sell." U.S. Tobacco Sales and Mktg. Co., Inc., v. Dep't of Revenue, 96 Wn. App. 932, 940, 982 P.2d 652 (1999) (internal quotation marks and citation omitted). Here, Toll Brothers expressed a willingness to purchase the property for $7.8 million, and Frye presented no evidence suggesting an alternative value for the property.

Because the Toll Brothers sale was not too speculative to support an award of damages, and the letter of intent reasonably estimates the property's value, substantial evidence supports the trial court's findings as to the Auburn property's value and JDH's damages.

f.  Good faith

Frye argues she cannot be liable for tortious interference because she acted in good faith.  "Good faith may privilege an [interferer]'s actions and thereby serve as an affirmative defense to a tortious interference claim." Greensun, 7 Wn. App. 2d at 777.  But as discussed above, by increasing her demands for payment and by maliciously filing the complaint and lis pendens, Frye did not act in good faith.

Because all the trial court's conclusions as to the foregoing elements of the tort are supported by the trial court's findings, which are in turn supported by substantial evidence, and Frye cannot claim she interfered in good faith, the trial court properly concluded Frye is liable for tortious interference with a business expectancy.

E.  Attorney Fees

Frye argues the trial court improperly awarded fees to JDH and Downie because (1) her claims were not based on the parties' purchase and sale agreement (PSA), (2) the counterclaims do not support an award of fees, (3) the fee provision in the Daycare note does not allow fees to Downie for escaping liability as a guarantor, and (4) the award is unreasonable and excessive since it does not use the lodestar method.  The respondents disagree on all counts, and request an award of appellate fees under RAP 18.1.  We agree with the respondents and award them fees on appeal.

"A party is entitled to attorney fees on appeal if a contract, statute, or recognized ground of equity permits recovery of attorney fees at trial and the

party is the substantially prevailing party." Hwang v. McMahill, 103 Wn. App. 945, 954, 15 P.3d 172 (2000). We review de novo a trial court's award of attorney fees under contract, and review a discretionary decision on fees and the reasonableness of the fee award for an abuse of discretion. Gander v. Yeager, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012). The trial court granted an attorney fee award of $263,916, with 60 percent of those fees allocated to defense of the claims related to the Auburn sale, 20 percent allocated to the counterclaims, and 20 percent to Frye's other monetary claims against Downie.

1. Fee award to JDH—PSA

The PSA under which Frye transferred the Auburn property to JDH allows for an award of attorney fees to the prevailing party in "any action . . . involving the [Auburn property] whether founded in tort, contract or equity." Frye argues the trial court improperly awarded fees based on her complaint because she did not seek rescission of the PSA and did not even mention it in her complaint.

However, in her complaint, Frye alleged Downie and JDH obtained the Auburn property under false pretenses and committed fraud by inducing her to enter a real estate contract with a false representation. Further, she requested rescission of her transfer of the Auburn property. Frye's claims plainly related to the Auburn property and the transfer of it—as required by the attorney fees provision in the PSA—whether or not she directly referenced the PSA. Thus, the trial court properly relied on the attorney fees provision in the PSA as a basis for awarding fees.

2.  Fee award to JDH—counterclaims[16]

The trial court based its award of fees for the counterclaims on the attorney fee clauses in the Auburn notes.  The trial court also granted attorney fees based on the slander of title cause of action because it concluded that Frye filed her complaint and lis pendens in bad faith.  Frye argues that JDH has no right to collect fees based on the Auburn notes.  Frye also argues that the trial court improperly concluded the complaint and lis pendens were filed in bad faith, so the trial court improperly awarded fees on slander of title grounds.

The Auburn notes provide, "Should suit be commenced to collect this note or any portion thereof, such sum as the Court may deem reasonable shall be added hereto as [attorney] fees."  It is unclear whether this provision constitutes a one-way attorney fee provision, but even if so, RCW 4.84.330 would render this provision bilateral, and allow JDH to recover under it for their counterclaims that stem from Frye's refusal to accept payment on the Auburn notes.  RCW 4.84.330 provides:

> In any action on a contract or lease entered into after September 21, 1977, where such contract or lease specifically provides that [attorney] fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether [they] is the party specified in the contract or lease or not, shall be entitled to reasonable [attorney] fees in addition to costs and necessary disbursements.

Additionally, "attorney fees are recoverable as special damages in a slander of title action."  Rorvig, 123 Wn.2d at 861.  While the trial court concluded

---

[16] The trial court granted attorney fees to Downie based on his defense of Frye's attempts to recover on the Daycare note, addressed below, and not on his tortious interference counterclaim.

that Frye acted in bad faith, it need not have done so to impose attorney fees for the slander of title action. Thus, the trial court properly determined that the success of JDH's breach of contract, tortious interference, and slander of title actions entitled them to attorney fees.

3. Fee award to Downie

Frye argues Downie is not entitled to attorney fees because the fees provision in the Daycare note entitles only the "Maker" of the note—i.e., Northshore Montessori—to attorney fees, but Downie is not the "Maker," and thus cannot recover.

The Daycare note states that "[t]he Maker shall pay all costs and expenses, including reasonable [attorney] fees . . . incurred in collecting payment on this note." RCW 4.84.330 renders this provision bilateral and likewise would allow the "Maker" of the note to recover reasonable attorney fees in actions incurred in collecting payment on the Daycare note.

While it is true that Downie did not make the Daycare note, Frye alleged that he was liable on it as a personal guarantor. The broad language of RCW 4.84.330 encompasses any action in which it is alleged that a person is liable on a contract, and Frye alleged as such against Downie here. Herzog Alum., Inc., v. Gen. Am. Window Corp, 39 Wn. App. 188, 197, 692 P.2d 867 (1984). Thus, the trial court properly granted attorney fees to Downie.

4. Method of computation

Frye argues the trial court erred in its computation of attorney fees because it did not use the lodestar method, and instead allowed block billing by

respondents' attorneys.

The lodestar method entails multiplying a reasonable number of hours times a reasonable hourly rate. Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983). A failure to address block billing concerns constitutes reversible error. Berryman v. Metcalf, 177 Wn. App. 644, 658–59, 312 P.3d 745 (2013). We review the reasonableness of a fee award for abuse of discretion. Gander, 167 Wn. App. at 647. "Discretion is abused when the trial court exercises it on untenable grounds or for untenable reasons." Berryman, 177 Wn. App. at 657.

Here, the trial court initially calculated an attorney fee award of $283,678.47, based on a $350 per hour rate paid to the respondents' attorney Michael Zeno. However, based on Zeno's 34-year experience and the prevailing hourly rate for attorneys of his experience, skill, and education, the trial court determined the award was unreasonably low and increased his hourly rate to $450, increasing the award by $69,640. The trial court additionally recognized that Jackson had performed considerable work on the case, noted that Jackson had spent 186 hours on legal tasks for the case at a rate of $400 per hour, and increased the award by $74,400. However, the trial court then recognized that Zeno had made entries based on block billing, and addressed that concern by returning to its initial fees calculation of $283,678.47. Then, the trial court further reduced the award to $263,916, finding some of the work performed by a paralegal involved in the case should receive a lower hourly rate.

The trial court addressed any concerns regarding block billing by returning

to its initial fees calculation at the lower, "unreasonable" rate. The trial court did not abuse its discretion, and the fee award was reasonable.

5. Appellate fees

Because we affirm the judgment in the respondents' favor, we also determine they are the prevailing parties on appeal. Since the trial court properly determined the PSA, Auburn notes, and slander of title action can serve as an appropriate basis for fees, we accordingly conclude that the respondents, as the prevailing parties, are entitled to attorney fees under the same terms, subject to their compliance with RAP 18.1.

We affirm.

_____
Chun, J.

WE CONCUR:

_____     _____
Brunner, J                    Appelwick, J.