# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| TERRY MARTIN, an individual, and M & M TECHNOLOGIES, INC., a Washington corporation, | No. 72597-1-I |
| Respondents, | DIVISION ONE |
| v. | |
| STANLEY SMITH and JANE DOE SMITH, husband and wife; and KERRY SIMSHAUSER and JANE DOE SIMSHAUSER, husband and wife, | PUBLISHED<br>FILED: February 8, 2016 |
| Appellants. | |
| NUPOWER TECHNOLOGIES, INC., | |
| Third Party Plaintiff, | |
| v. | |
| TERRY MARTIN, an individual, and M & M TECHNOLOGIES, INC., a Washington corporation, | |
| Third Party Defendants. | |

Cox, J. – Stanley Smith appeals the trial court's dismissal of his breach of warranty counterclaim against M & M Technologies Inc. He argues that M & M breached the express warranties in two agreements with him. Specifically, he argues that M & M was the subject of a material adverse claim by the Securities and Exchange Commission (SEC) at the time M & M warranted otherwise. He is correct. We reverse.

This is a commercial dispute between M & M and Smith over a license agreement and option agreement, both of which are dated April 11, 2007. Prior to the execution of these agreements, M & M became aware of an investigation by the SEC of a "Ponzi scheme" involving an entity known as International Fiduciary Corporation (IFC). The SEC informed Terry Martin, a principal of M & M, that it believed IFC paid M & M with funds from the Ponzi scheme. There was no indication that either Martin or M & M was involved in the scheme, only that they had received funds from the scheme.

In February 2007, the SEC sent a letter informing Martin and M & M that its staff was considering recommending them as relief defendants in its lawsuit against IFC in the federal district court in Virginia. The letter also stated that the SEC might seek disgorgement of investor funds they received from IFC. In March 2007, the SEC's assistant director further corresponded with Martin and M & M concerning its investigation.

After these communications with the SEC, in March 2007, Smith met with Martin and M & M's accountant, Craig Forhan, to discuss a pending business arrangement involving licensing of M & M technology to Smith. At this meeting, Martin and Forhan disclosed to Smith that the SEC was investigating M & M and provided him with the SEC letters concerning its investigation. They also informed him that M & M had a cash flow problem. After this meeting, Smith loaned M & M $200,000.

By its First Amended Complaint dated April 9, 2007, the SEC named Martin, M & M, and others not involved in this litigation as "relief defendants" in an action in the U.S. District Court for the Eastern District of Virginia. According to this complaint, the "relief defendants" possessed illegally obtained investor funds or assets acquired from IFC. The relief sought against the relief defendants appears to be limited to return of these funds. A copy of this complaint was admitted as an exhibit in the trial of this action.

In April 2007, M & M and Smith entered into three agreements, all of which are dated April 11, 2007. The License Agreement between M & M and Smith provides for licensing of certain property in three states. The Option Agreement between M & M and Smith provides for licensing of property in other states. The Research, Development and Testing Agreement between M & M and Smith provides for certain services. The parties changed Smith's $200,000 loan, and the interest owed, into a down payment towards the license agreement.

As part of the license agreement, M & M warranted that it was not presently the subject of any claim that would have a material adverse effect on Smith. A similar provision is contained in the option agreement. "Claim" is not defined in either agreement.

In May 2007, Smith learned that M & M had been named as a relief defendant in the federal court action in Virginia. That same month, M & M and Martin were served with process in that litigation.

After Smith failed to meet his obligations under the license and option agreements, Martin and M & M commenced this action against Smith for breach

of contract. In response, Smith asserted several counterclaims, including breach of warranties under the license and option agreements.

After a bench trial, the court decided that Smith failed to prove there was a breach of the warranties in the two agreements. The court also found against Smith on other claims that he asserted.

Smith appeals.

## BREACH OF WARRANTIES

Smith's sole argument on appeal is that the license and option agreements are void because M & M breached the warranties stated in the agreements.[1] Specifically, he argues that M & M was the subject of a material adverse claim by the SEC as of the date of both agreements. Accordingly, Smith claims he is entitled to relief. We agree.

"When the trial court has weighed the evidence, our review is limited to determining whether the trial court's findings are supported by substantial evidence and, if so, whether the findings in turn support the conclusions of law."[2] Substantial evidence "exists so long as a rational trier of fact could find the necessary facts were shown by a preponderance of the evidence."[3]

---

[1] Appellant's Opening Brief at 13; Appellant's Reply Brief at 8.

[2] Prostov v. Dep't of Licensing, 186 Wn. App. 795, 819, 349 P.3d 874 (2015).

[3] In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

"'We will not disturb findings of fact supported by substantial evidence even if there is conflicting evidence.'"[4] Additionally, unchallenged findings are verities on appeal.[5] We review de novo the trial court's conclusions of law.[6]

Washington courts "follow the objective manifestation theory of contracts."[7] When interpreting an agreement, we focus on the agreement's objective manifestations to ascertain the parties' intent.[8] "We impute an intention corresponding to the reasonable meaning of the words used."[9] The parties' subjective intent is irrelevant if we can ascertain their intent from the words in the agreement.[10]

We give words "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent."[11] We interpret only what was written in the agreement, not what the parties intended to write.[12]

---

[4] Cummings v. Dep't of Licensing, 189 Wn. App. 1, 11, 355 P.3d 1155 (2015) (internal quotation marks omitted) (quoting McCleary v. State, 173 Wn.2d 477, 514, 269 P.3d 227 (2012)).

[5] A.W., 182 Wn.2d at 711.

[6] In re Pers. Restraint of Cross, 180 Wn.2d 664, 681, 327 P.3d 660 (2014).

[7] Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005).

[8] Id.

[9] Id.

[10] Id. at 504.

[11] Id.

[12] Id.

Additionally, "[a] contract provision is not ambiguous merely because the parties to the contract suggest opposing meanings."[13] We "will not read ambiguity into a contract 'where it can reasonably be avoided.'"[14]

In Berg v. Hudesman,[15] the supreme court "recognized the difficulties associated with interpreting contracts solely on the basis of the 'plain meaning' of the words in the document."[16] Interpreting a contract "involves 'one person giving a meaning to the symbols of expression used by another person.'"[17] The supreme court adopted the "context rule" and recognized that the parties' intent "cannot be interpreted without examining the context surrounding an instrument's execution."[18]

Since Berg, the supreme court has further explained the "context rule." It explained "that surrounding circumstances and other extrinsic evidence are to be used 'to determine the meaning of specific words and terms used' and not to

---

[13] GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074, review denied, 181 Wn.2d 1008 (2014).

[14] Id. (internal quotation marks omitted) (quoting Mayer v. Pierce County Med. Bureau, Inc., 80 Wn. App. 416, 421, 909 P.2d 1323 (1995)).

[15] 115 Wn.2d 657, 801 P.2d 222 (1990).

[16] Hearst Commc'ns, Inc., 154 Wn.2d at 502.

[17] Id. (alternation in original) (internal quotation marks omitted) (quoting Berg, 115 Wn.2d at 663).

[18] Id.

'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'"[19]

"When the parties by the terms of their contract expressly stipulate that a representation shall be regarded as material, it ceases to be a representation only, and becomes a warranty."[20] "'Warranties differ from representations, then, in that falsity of a representation will defeat the contract only where it is material, as representations are merely inducements to the making of the contract.'"[21] For a warranty, "'the statement is made material by the very language of the contract, so that a misrepresentation of a matter warranted is a breach of the contract itself.'"[22] "'Therefore the falsity of a statement which is made a warranty will avoid the contract without regard to whether it can be considered as material in any way to the risk or the loss.'"[23] "'A warranty must be strictly true.'"[24]

*Claim*

A threshold issue is the meaning of the word "claim" in the warranty provisions of the agreements. They both state:

---

[19] Id. at 503 (emphasis omitted) (quoting Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999)).

[20] Miller v. Commercial Union Assur. Co., 69 Wash. 529, 534, 125 P. 782 (1912).

[21] Id. (quoting Emlin McClain, Fire Insurance, in 19 CYCLOPEDIA OF LAW AND PROCEDURE 565, 683 (William Mack ed., 1905)).

[22] Id. (quoting McClain, supra, at 683).

[23] Id. (quoting McClain, supra, at 683).

[24] Id. at 535 (quoting Poultry Producers' Union v. Williams, 58 Wash. 64, 66, 107 P. 1040 (1910)).

> Each party (the "Warranting Party") warrants and represents to the other Party that . . . the Warranting Party is not presently the subject of, nor the proponent of, any *claim* that would have a material adverse affect [sic] on the other Party.[25]

Neither agreement defines the word "claim." But there does not appear to be any dispute that both warranties are effective as of the dates of the agreements: April 11, 2007. Likewise, there is no dispute that the SEC request for return of funds M & M received from IFC is one that "would have a material adverse [effect] on [Smith]."[26] In its oral decision, the trial court also stated that "[i]f such a claim existed, it would be a material claim that might have a material adverse effect on [Smith] . . . ."[27] And neither party in this appeal challenges this observation by the trial judge.

The primary dispute between the parties is over the meaning of the word "claim" in section 12.1(g) of the license agreement warranty and section 5.1(g) of the option agreement warranty. Because this term is undefined in the agreements, we turn to Black's Law Dictionary for a definition, which defines claim as, among other things:

> A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for.[28]

Another dictionary gives the word a similar meaning:

---

[25] Trial Exhibit 1, p. 7 (emphasis added); accord Trial Exhibit 2, p. 6.

[26] Id.

[27] Report of Proceedings (the court's oral decision) (July 22, 2014) at 11.

[28] Claim, BLACK'S LAW DICTIONARY, 301 (10th ed. 2014).

[s]omething claimed in a formal or legal manner [or] [t]he sum of money demanded.[29]

With these definitions in mind, we turn to the question whether substantial evidence supports the trial court's finding on the claim issue. The court found as follows:

> [A]t the time of the signing of the contracts, a SEC claim against M & M Technologies, as a relief defendant for $550,000, was an inchoate potential claim only, and no amended complaint naming M & M Technologies as a relief defendant had been filed or served by the SEC.[30]

A close reading of these definitions shows that they include a demand for money. Notably, the definitions say nothing to limit a claim to the filing of a lawsuit. Thus, we conclude that a claim may be asserted in a complaint (whether or not filed).

Nothing in these definitions restricts a claim to something asserted in a complaint (whether or not filed). This is particularly important here because the plain words of the warranties make no reference to either a "filed claim" or a "lawsuit." Rather, the warranties simply state the word "claim."

Applying these definitions of claim to the facts of this case, we conclude that the SEC had a claim against M & M as of the April 9, 2007 date of its First Amended Complaint. The SEC's First Amended Complaint, a copy of which was admitted into evidence, states a demand for return of "illegally obtained investor funds" from IFC that M & M and others possessed.

---

[29] THE AMERICAN HERITAGE DICTIONARY, 350 (5th ed. 2015), https://www.ahdictionary.com/word/search.html?q=claim.

[30] Finding of Fact 3.22, Clerk's Papers at 14.

9

At oral argument in this court, M & M argued that the context of the negotiations between the parties requires that we conclude that the word "claim" in the warranties must mean "filed claim." We disagree.

First, the plain words of the warranties state "claim," not "filed claim." We know of no authority that permits us to add words to the agreements that M & M drafted in the guise of this court construing these documents. Rather, our task is to interpret only what was written in the agreement, not what the parties (or the drafter) intended to write.[31]

Second, under Hearst Communications, Inc. v. Seattle Times Co., "surrounding circumstances and other extrinsic evidence are to be used 'to determine the meaning of specific words and terms used' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'"[32] The context of the parties' negotiations cannot be used to modify the word claim in the warranty provisions of the two agreements.

For these reasons, we reject M & M's attempt to add words to the agreements that are not there.

The trial court characterized the SEC's actions as "an inchoate potential claim only."[33] This appears to have been based on the evidence that the SEC was investigating the Ponzi scheme prior to the date of the agreements.

---

[31] Hearst Commc'ns, Inc., 154 Wn.2d at 504.

[32] Id. at 503 (emphasis omitted) (quoting Hollis, 137 Wn.2d at 695-96).

[33] Clerk's Papers at 14.

We need not address whether a claim by the SEC existed during its investigation. That is because the record is clear that as of April 9, 2007, the date of the SEC's First Amended Complaint, the investigation had ripened into a SEC claim for return of the investor funds that M & M received from IFC.

In short, there is no substantial evidence to support the finding that there was "an inchoate potential claim only" by the SEC as of the April 11, 2007 date of the agreements.[34] To the contrary, there is substantial evidence that a claim by the SEC existed when the warranties in the agreements were executed. That evidence is the First Amended Complaint dated April 9, 2007.

*Warranties and Representations*

The next question is whether there was a breach of the warranties of the agreements. We hold that there was.

The supreme court stated the law on warranties and representations in Miller v. Commercial Union Assurance Co.[35] As that case states, "the falsity of a statement which is made a warranty will avoid the contract without regard to whether it can be considered as material in any way" to the warranted matter.[36] Miller also states "'[a] warranty must be strictly true.'"[37]

Here, the documents before us clearly state that the text pertaining to warranties is just that. They are not mere representations. Thus, the falsity of

---

[34] Id.

[35] 69 Wash. 529, 125 P. 782 (1912).

[36] Id. at 534.

[37] Id. at 535 (quoting Poultry Producers' Union, 58 Wash. at 66).

11

the warranties that there were no claims at the time the agreements were executed must void the agreements.

It is not legally significant whether the warranted matter is material. In any event, we have the unchallenged observation by the trial court that the existence of a claim by the SEC against M & M would be material. That observation makes sense under the circumstances of this case.

Whether the warranties are affected by M & M's apparent lack of knowledge of the SEC's First Amended Complaint when the parties executed the warranties is an issue that the parties do not completely address on appeal. The trial judge appears to have relied on the fact that neither party knew of the First Amended Complaint until sometime in May 2007. But that is analytically immaterial under the case authority we have located.

Jeffery v. Hanson involved a contract for the sale of a tractor.[38] Sidney Jeffery sought to buy a tractor from Virgil Pague.[39] Jeffery agreed to buy the tractor if it were warranted to be 90 percent new and never used in salt water.[40] Pague signed a statement stating: "'I hereby make statement that [the tractor] is 90% new and has never been in salt water. I make this statement based upon facts given to me by the seller from whom I purchased this bulldozer and to the best of my knowledge believe that this statement is true.'"[41]

---

[38] 39 Wn.2d 855, 239 P.2d 346 (1952).

[39] Id. at 856.

[40] Id.

[41] Id. at 856-57.

As it turned out, the tractor "was not as warranted when delivered to Jeffery."[42] In the suit that followed, the trial court entered a judgment against Pague, concluding that Pague's statement was a warranty and that he breached the warranty.[43]

Pague appealed, arguing that the statement was not a warranty.[44]

The supreme court concluded that the statement was a warranty, stating that it was "a positive statement of the condition of the tractor," and that Pague could not "escape" by relying on the statement's language.[45] The court specifically stated that Pague could not rely on the fact that the statement "was based upon facts given to him by his vendor, and that he believed it to be true to the best of his knowledge."[46] Most importantly, the court stated:

> The source of his information is not material. He affirmed a fact regarding the equipment, and he did so to meet [Jeffery's requirements] before the sale. It was not sales talk or an expression of his opinion, nor was it intended to be. It tended to and did induce the sale, and Jeffery relied upon it as Pague knew he would. It meets the requirements of an express warranty set forth in the statute . . . .[47]

Accordingly, the supreme court affirmed the judgment.[48]

---

[42] Id. at 857.

[43] Id.

[44] Id.

[45] Id.

[46] Id. at 857-58.

[47] Id. at 858.

[48] Id. at 859.

Here, following <u>Miller</u> and <u>Jeffery</u>, we must conclude that the warranties in this case are not affected by the fact that M & M did not know of their falsity as of the date of making the warranties. It does not matter that it only learned of the falsity in May 2007. The case law is clear that what is material is the truth or falsity of the warranty when made. On this record, the warranties were clearly false when made: April 11, 2007.

Because the warranties were false, the agreements are void. Smith is entitled to appropriate relief due to the breach of the express warranties. Because the parties have not fully briefed on appeal the extent of relief, we remand with directions to the trial court to address that question.

We reverse the judgment and remand with these instructions.

Cox, J.

WE CONCUR:

Trickey, J

Dwyer, J.

14