# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KENNETH WREN and ALICE WREN, husband and wife; | No. 56441-6-II |
| Respondents, | |
| v. | |
| STANFORD AND SONS, LLC, a Washington limited liability company; DAVID G. WHITEHEAD, individually; J & N INVESTMENTS INC., a Washington corporation; HENRY L. RUSSELL II, individually; and the marital community of HENRY L. and VICTORIA L. RUSSELL; DUWARD WILLIAM FRAME, IV, individually; FIRST HORIZON BANK, successor by conversion to FIRST TENNESSEE BANK NATIONAL ASSOCIATION d/b/a FIRST HORIZON HOME LOANS; NATIONSTAR MORTGAGE LLC, d/b/a, MR. COOPER, a Delaware limited liability company; and FIRST NICHOLAS D. LECLERQ AND SUSAN L. LECLERQ FAMILY LLC, a Washington limited liability company; | UNPUBLISHED OPINION |
| Defendants, | |
| HERBERT L. WHITEHEAD III, individually; the marital community of HERBERT L. WHITEHEAD III and JENNIFER L. WHITEHEAD; SOUTHWEST ENTERPRISES, LLC, a Washington limited liability company; MT. VIEW ENTERPRISES, LLC, a Washington limited liability company; WHITEHEAD CONSULTING, LLC., a Washington limited | |

liability company; and WHITEHEAD
ENTERPRISES, LLC. a Washington limited
liability company;

Appellants.

GLASGOW, C.J.— In 2009, Herbert L. Whitehead helped his friend Kenneth Brautigan start a car dealership, Stanford & Sons (S&S). Whitehead then worked at S&S. In 2010, S&S extended a line of credit to Whitehead, his wife, and several companies the couple owned. Brautigan wrote Whitehead numerous checks over the next few years with "loan" in the memo line. Whitehead endorsed and deposited the checks.

In the meantime, Ken and Alice Wren loaned significant amounts to S&S. S&S later defaulted on that debt and it assigned the Wrens most of its and Brautigan's assets, including Whitehead's line of credit. Whitehead then failed to make payments as required by the promissory note and the Wrens sued to collect on the debt. Whitehead filed several counterclaims, alleging in part that the Wrens owed him money because he had a credit balance on the line of credit.

The Wrens moved for partial summary judgment to dismiss some of Whitehead's counterclaims, including the ones addressing the line of credit. The trial court granted partial summary judgment and denied reconsideration. The trial court entered final judgment against Whitehead on the debt for the line of credit, eventually imposing a 36 percent interest rate, the default rate set by the promissory note.

Whitehead appeals. He argues the trial court erred by granting partial summary judgment because there are genuine issues of material fact as to whether the payments S&S made to him were loans under the line of credit or payment for work he performed for S&S. He also argues the trial court erred by imposing a 36 percent interest rate. Both parties seek appellate attorney fees.

We agree that there are genuine issues of fact as to the nature of the payments S&S made to Whitehead. We reverse and remand for the trial court to vacate the Wrens' judgment against Whitehead and engage in further proceedings consistent with this opinion. If another judgment is entered in the future, the parties may raise the issue of the correct interest rate before the trial court. Neither party is entitled to attorney fees at this time.

FACTS

I. BACKGROUND

In 2009, Brautigan founded S&S, a limited liability corporation (LLC), operating the company as a car dealership. Brautigan was the sole owner and member. Whitehead was friends with Brautigan and consulted with him about starting the company, but Whitehead had no ownership interest in S&S.

A.      Whitehead Promissory Note for Line of Credit

In March 2010, S&S extended a $250,000 line of credit to Whitehead, his wife, and several LLCs the Whiteheads owned. Whitehead used several vehicles and pieces of real property, including a house in Lake Tapps, as collateral.

The parties signed and executed the promissory note, security agreements, and deed of trust on the same day in March 2010. They also filed public record financing statements in March 2010. The promissory note stated that the makers, the Whiteheads and their LLCs (the Whiteheads), would pay an annual interest rate of 12 percent on the principal balance. If the Whiteheads had a credit balance, or negative debt, interest would accrue on the balance at a 3 percent annual rate. There was also an initial loan fee of 10 percent of the total line of credit, or $25,000, and an annual

renewal fee of 5 percent of the total line of credit, or $12,500. The full amount of the principal debt and interest matured and became due in March 2020.

If the Whiteheads were more than five days late in making a payment, a late charge of 10 percent of the overdue payment applied to the balance due and the Whiteheads would be in default. In the event of default, the holder of the note could call in the entire principal debt, interest, "and any other amounts owing under th[e] Note." Clerk's Papers (CP) at 8. If the Whiteheads defaulted, including failure to make the balloon payment at maturity, the note stated that it would "bear interest at the lesser of the rate of thirty-six percent (36%) per annum or the maximum interest rate allowed by law." *Id.*

The note also required the Whiteheads "to pay all costs, expenses[,] and attorney's fees incurred by Holder in the exercise of any remedy (with or without litigation) under this Note . . . in any proceeding for the collection of the debt evidenced by th[e] Note" where the holder of the note prevailed. CP at 10. The note stated that it contained the parties' "entire agreement" and that "[n]o prior agreement, statement, or promise written or oral made by any party to this Note that is not contained herein shall be binding or valid, save each Deed of Trust speaks for itself." CP at 10-11.

B.      LeClerq Judgment Against Whitehead

The LeClerqs, a couple who had bought a separate business from Whitehead, sued him for breach of contract and obtained a judgment against him in May 2010 for approximately $245,000. In the summer of 2013, they sought to collect that judgment. Whitehead e-mailed Brautigan in July 2013, telling him, "You need to start getting info together [as soon as possible] to protect your

interest." CP at 1605. Whitehead then sent Brautigan spreadsheets that Whitehead described as "what I think the accounting is for my Line of Credit." *Id.*

Brautigan filed a declaration as an interested party in the LeClerq lawsuit. He stated that since March 2010, S&S had loaned approximately $239,000 to the Whiteheads under the line of credit. Due to partial repayments, Brautigan stated that the Whiteheads owed S&S a remaining balance of roughly $63,000. Brautigan asserted that the line of credit was executed in March 2010 and gave S&S superior secured interests in most of Whitehead's assets, including his Lake Tapps house, limiting what could be taken to satisfy the LeClerqs' May 2010 judgment.[1]

C.    S&S Payments to Whitehead 2013 to 2017

Whitehead did not report any earned income on his taxes from at least 2013 until 2017. During that time period, he endorsed and cashed numerous checks from S&S where Brautigan handwrote "loan" in the memo line on the face of the check. S&S also paid for Whitehead's medical insurance during some of the time that he performed work for the company.

II. WREN LOANS AND THIS LAWSUIT

A.    Loans and Default

In 2016, the Wrens loaned S&S $1.2 million. In 2017, they loaned S&S an additional $500,000. In 2019, Brautigan closed the car dealership. S&S then defaulted on these loans and began conveying its assets to the Wrens to avoid foreclosure. This included "[a]ll claims and causes of action" S&S had "against third parties in contract, tort, equity, or otherwise," such as Whitehead's line of credit. CP at 150.

---

[1] Whitehead asserts that he settled the lawsuit, but our record does not show whether the LeClerq judgment was satisfied. *See* CP at 810-11.

In January 2020, the Wrens sued numerous defendants, including S&S, the Whiteheads as individuals, and all of the Whiteheads' LLCs that were makers in the line of credit promissory note.

B.      Complaint, Answer, and Counterclaims in this Case

The statement of facts in the Wrens' complaint addressed the line of credit:

> 110.    On March 14, 2010, Stanford and Sons, LLC, as Lender and Holder, agreed to extend a $250,000 Line of Credit to [Whitehead, his wife, and three of their LLCs], all of whom were referred to and defined as the "Makers". This loan is hereinafter referred to as the "S&S Line of Credit".
> 111.    Also on March 14, 2010, and to secure the S&S Line of Credit, Herbert L. Whitehead and Jennifer L. Whitehead executed a deed of trust on the Lake Tapps Real Property . . . [that] was recorded in Pierce County.

CP at 1466.

The complaint listed 10 causes of action. In part, the Wrens alleged that Whitehead had failed to make payments on the line of credit, constituting a breach of contract. Among other damages, the Wrens sought approximately $756,000 that they argued was owed under the line of credit, and they sought to quiet title in Whitehead's Lake Tapps house. Because they thought Whitehead was moving or disposing of assets, the Wrens also brought a replevin action seeking to safeguard certain property.

In February 2020, Whitehead filed a declaration in response to the Wrens' replevin claim, stating that "On March 14, 2010, my wife and I, along with several entities we owned, executed a promissory note wherein Stanford and Sons offered us a line of credit of up to $250,000." CP at 1084. Whitehead attached a signed copy of the promissory note, which was dated March 14, 2010.

In March 2020, in his answer to the complaint, Whitehead admitted paragraphs 110 and 111. Whitehead then asserted, "On or about March 14, 2010, Butch, his wife, [and three of their

LLCs] executed a Promissory Note/Line of Credit as the 'Makers' whereby Stanford and Sons would loan Makers money under a line of credit of up to $250,000." CP at 1186-87. But Whitehead denied that S&S had ever loaned him "any money under the line of credit," asserting that S&S "did not have any money to do so." CP at 1187. "Instead, over the years, [the] Makers loaned Stanford and Sons at least, but likely more than, $160,000." *Id.* Whitehead asserted this money had never been paid back.

Whitehead raised six counterclaims. One counterclaim alleged that as holders of the line of credit, the Wrens owed Whitehead for money that he had loaned S&S. Whitehead also sought to quiet title in his Lake Tapps house.

## C.    Partial Summary Judgment

In August 2021, the Wrens moved for partial summary judgment. They asked the trial court to grant their claims regarding S&S's failure to repay its loans and Whitehead's default on the line of credit, and they asked the court to quiet title in Whitehead's Lake Tapps house in their favor. They also sought to dismiss Whitehead's counterclaims that S&S or the Wrens owed him money under the line of credit and to quiet title for the house in his favor.

### 1.    Facts and arguments presented below

The Wrens argued that there was no genuine dispute of material fact that Whitehead and S&S executed the line of credit or that S&S loaned Whitehead money under the line of credit. They contended that under contract interpretation principles, the trial court could consider only the language in the promissory note and the checks, not Whitehead's assertions about what the documents represented.

The Wrens submitted excerpts of a December 2020 deposition where Brautigan declared that when Whitehead worked for S&S, the company would loan Whitehead money instead of compensating him. "He wanted to be borrowing money. He did not want to get compensation." CP at 652. Brautigan stated that any payment made to Whitehead between 2010 and early 2016 was a draw under the line of credit. Brautigan did not recall why Whitehead wanted to be loaned money instead of being paid outright, but he was certain he and Whitehead had discussed the loans when they started the company.

The Wrens designated expert witnesses including the office manager for the Wrens' car dealerships, who had 23 years of experience in the industry and extensive experience managing the financial operations of dealerships, and a forensic accountant. The office manager submitted calculations demonstrating the amount Whitehead owed under the line of credit. The Wrens provided the trial court with the office manager's spreadsheets, which showed that when the line of credit matured in March 2020, Whitehead owed roughly $886,000. The forensic accountant vetted and approved the office manager's calculations. Whitehead's failure to pay the amount due upon maturity of the note constituted a default under the note's terms.

The Wrens also submitted the source documents that the office manager used to create her spreadsheets. These included images of checks from S&S to Whitehead with "loan" in the memo line that Whitehead had endorsed and deposited. Between 2013 and 2016, Whitehead cashed at least 39 checks that were identified as loans on the face of the check, plus one additional check Brautigan identified as a loan in his deposition testimony.

Whitehead opposed partial summary judgment, contending that there was a dispute of material fact about whether he owed money under the line of credit. In a declaration filed in 2021,

he insisted that the checks were all compensation for work performed and that he never received any loans under the line of credit. In support, Whitehead submitted text messages from Brautigan in 2012 and 2013 that asked Whitehead for his medical insurance bills and referred to one check as a paycheck. He also submitted an e-mail from Brautigan in 2015 that described the business's expenses "other than our income." CP at 743. Whitehead alleged these documents showed he was being treated as an employee, rather than the recipient of a loan. He stated that "Brautigan never even asked Whitehead to make a payment on the 2010 Line of Credit." CP at 674.

In direct contradiction to his earlier 2020 declaration addressing replevin, where he swore that he and his wife executed the promissory note in March 2010, Whitehead stated in his 2021 declaration, that although a deed of trust "was executed and recorded in March 2010 . . . the 2010 Line of Credit [promissory note] was not even written or executed until August 2013." CP at 687. Whitehead explained that he and Brautigan executed the 2010 promissory note for the line of credit, as well as other backdated promissory notes, in August 2013 to make it look like Whitehead owed S&S a great deal of money to reduce the amount the LeClerqs could collect under their 2013 judgment against Whitehead. Whitehead stated, "Brautigan apparently executed a declaration [in the 2013 lawsuit] stating that Stanford and Sons had loaned me approximately $239,000 over the years, and that at the time of the declaration, I owed $63,435.47. This was not true. Mr. Brautigan knows it was not true either." CP at 690. "Brautigan would write 'loan' on the checks, but he knew they were not loans." CP at 691. As a result, Whitehead claimed he did not owe anything for the line of credit before August 2013. Whitehead's 2021 declaration does not mention the security agreements or financing statements that were signed and dated the same day as the deed of trust and promissory note, in March 2010.

9

Whitehead's 2021 declaration emphasized that S&S had never issued him tax forms to reflect income or loan borrowing or repayment. He also asserted that it was unreasonable to believe that he owed money under the line of credit because "there is not a single communication that exists where Brautigan is asking me to pay him money owing on the 2010 Line of Credit." CP at 693.

In reply, the Wrens argued that "Whitehead has failed to identify a single check" included in the debt calculation "that was not properly identified as a 'loan' check." CP at 809. Thus, the Wrens asserted there was "no factual dispute" about the accuracy of the calculation or the proper inclusion of checks used in that calculation beyond Whitehead's bald assertions. *Id.*

The Wrens also argued that Whitehead was judicially estopped from saying that he had executed the promissory note in August 2013, rather than in 2010, because his 2020 declaration stated that he executed the promissory note in March 2010. Further, the associated deed of trust was recorded and notarized in March 2010, and it referred to a promissory note executed the same day.

### 2. Trial court ruling

The trial court acknowledged that "the standard for summary judgment is taking the evidence in the light most favorable to the non-moving party," Whitehead. Verbatim Rep. of Proc. at 31. But the trial court also appeared to weigh the evidence, stating "[Whitehead's] argument is that these weren't really loans. This was compensation. The evidence . . . points in the exact opposite direction here." *Id.*

The trial court granted the Wrens' motion for partial summary judgment on causes of action related to the line of credit and repayment of the Wrens' loan to S&S. The trial court ruled that

there was no genuine dispute that Whitehead executed the line of credit in 2010, accrued roughly $886,000 in debt under the line of credit, and failed to repay that debt when the line of credit matured in March 2020. And the trial court dismissed Whitehead's counterclaims alleging that S&S owed him money under the line of credit and also dismissed Whitehead's counterclaim to quiet title in the Lake Tapps house. The trial court ruled that Whitehead's interest in the house was judicially foreclosed and that Whitehead owed the Wrens approximately $886,000 under the line of credit, plus a 10 percent late charge, for a total of roughly $975,000. Finally, the trial court applied the promissory note's default interest rate of 36 percent to the amount due. The trial court did not make any conclusions regarding judicial estoppel.

Whitehead moved for reconsideration, arguing the trial court had made factual findings and credibility determinations. He also argued the trial court should have applied a 12 percent interest rate to the judgment because that was the maximum interest rate allowed by law. The trial court denied reconsideration.

D.      Entry of Judgment

The Wrens moved for entry of final judgment regarding the line of credit. The trial court entered final judgment against Whitehead on the claims resolved by the partial summary judgment. After fees, costs, and prejudgment interest, the trial court ruled that Whitehead owed the Wrens roughly $1.6 million. The trial court imposed the postjudgment interest rate of 36 percent.

Whitehead appeals the order granting summary judgment, the order denying his motion for reconsideration, and the order entering final judgment.

ANALYSIS

I. PARTIAL SUMMARY JUDGMENT

Whitehead argues that there are genuine disputes of material fact about when the promissory note was executed and whether he was ever loaned money under the line of credit. The Wrens respond that we should judicially estop Whitehead from denying that the payments were loans because he provided Brautigan with calculations of his debt for the 2013 lawsuit and Brautigan filed a declaration in that case asserting a superior claim against Whitehead based on the line of credit, thereby reducing Whitehead's liability to the LeClerqs. S&S and Brautigan argue that Whitehead conceded the existence of the line of credit and admitted to taking out loans under the line of credit by endorsing and cashing the checks that said "loan" in the memo line. We judicially estop Whitehead from arguing that the promissory note for the line of credit was executed after 2010, but we agree with Whitehead that there is a genuine dispute of material fact as to whether the payments were loans.

A.    Judicial Estoppel

We cannot apply judicial estoppel as requested by the Wrens, but Whitehead is nevertheless bound by the 2020 declaration where he swore that he executed the promissory note in 2010.

"'Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.'" *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007) (quoting *Bartley-Williams v. Kendall*, 134 Wn. App. 95, 98, 138 P.3d 1103 (2006)). "Judicial estoppel was not designed as a trap for the unwary." *Mercer Island Sch. Dist. v. Office of Superintendent of Pub.*

*Instruction*, 186 Wn. App. 939, 973 n.25, 347 P.3d 924 (2015). The doctrine serves to preserve respect for judicial proceedings and avoid "inconsistency, duplicity, and waste of time." *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 861, 281 P.3d 289 (2012). The fact that two assertions were made within the same trial does not preclude us from applying judicial estoppel. *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."); *King v. Clodfelter*, 10 Wn. App. 514, 519, 518 P.2d 206 (1974), *rejected on other grounds*, *Anfinson*, 174 Wn.2d at 866.

In deciding whether to apply judicial estoppel, courts consider three main factors. We examine (1) "whether the party's later position is 'clearly inconsistent with its earlier position,'" (2) whether accepting the inconsistent position would "'create the perception'" that a court was misled, and (3) whether accepting the inconsistent position "would create an unfair advantage for the asserting party or an unfair detriment to the opposing party." *Anfinson*, 174 Wn.2d at 861 (internal quotation marks omitted) (quoting *Arkison*, 160 Wn.2d at 538-39).

Here, Brautigan filed the declaration in the LeClerq case on his own behalf as an interested party, so we cannot bind *Whitehead* to the assertions that *Brautigan* made in that document. The Wrens offer no case that applies judicial estoppel against one party based on sworn statements made by another party.

However, Whitehead did take directly opposite factual positions before the trial court in this case. His 2020 sworn declaration addressing replevin stated that he and his wife executed the promissory note in 2010. Whitehead also admitted in his answer to the complaint that the line of credit began in 2010, including affirmatively stating that he executed the promissory note in March

2010. In 2021, he began asserting that he and Brautigan executed the promissory note for the line of credit in August 2013 but backdated it to March 2010. He has maintained this second position ever since. The trial court apparently accepted the first position when it concluded that there was no dispute that Whitehead executed the line of credit ten years before its maturity in 2020.

Whitehead's two positions are clearly inconsistent. *Arkison*, 160 Wn.2d at 538. Further, accepting the later inconsistent position would create the perception that either this court (believing Whitehead's current assertion that the promissory note was not executed until 2013) or the trial court (believing his prior assertion that the promissory note was executed in 2010) has been misled. *Anfinson*, 174 Wn.2d at 861. And accepting the assertion that the line of credit did not exist until 2013 would substantially reduce Whitehead's liability to the Wrens in the present case, creating an unfair advantage for Whitehead and detriment to the Wrens. *Id*. Barring Whitehead from that position enforces the principle that sworn declarations carry significant weight. *See id*.

We hold that Whitehead is judicially estopped from asserting that the line of credit did not exist, or that the promissory note for the line of credit was not executed until 2013.

B.      Partial Summary Judgment

The Wrens argue that under contract principles, we must interpret the promissory note creating the line of credit and the subsequent checks written to Whitehead based solely on the language in the note and checks, not later assertions by the parties about what they meant. But the evidence that Whitehead presented created a genuine dispute of material fact, so we disagree.

1.      Standard of review and summary judgment principles

We review a grant of summary judgment de novo, engaging in the same inquiry as the trial court. *Westberry v. Interstate Distrib. Co.*, 164 Wn. App. 196, 204, 263 P.3d 1251 (2011).

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "A material fact is one that affects the outcome of the litigation." *Owen v. Burlington N. Santa Fe R.R.*, 153 Wn.2d 780, 789, 108 P.3d 1220 (2005).

As the moving party, the Wrens had the burden to show that there was no genuine issue of material fact. CR 56(c). After this initial showing, "the nonmoving party must set forth specific facts rebutting the moving party's contentions." *Elcon Constr., Inc. v. E. Washington Univ.*, 174 Wn.2d 157, 169, 273 P.3d 965 (2012). We must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* at 164. "An issue of material fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 86, 419 P.3d 819 (2018).

2.      Principles governing promissory notes and written instruments

The failure to repay a promissory note for a line of credit can be the foundation for a breach of contract claim. *See First Citizens Bank & Tr. Co. v. Harrison*, 181 Wn. App. 595, 598, 326 P.3d 808 (2014). Courts focus on a contract's "objective manifestations to ascertain the parties' intent" in making the contract. *Martin v. Smith*, 192 Wn. App. 527, 532, 368 P.3d 227 (2016).

We interpret written instruments as a matter of law. *In re Est. of Larson*, 71 Wn.2d 349, 354, 428 P.2d 558 (1967). Courts "generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent," and "[w]e impute an intention corresponding to the reasonable meaning of the words used." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503-04, 115 P.3d 262 (2005). The Washington Supreme Court has "explained that surrounding circumstances and other extrinsic

evidence are to be used 'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" *Id.* at 503 (quoting *Hollis v. Garwall, Inc.,* 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999)). But Wren has pointed us to no authority, and we have found none, that applies *Hearst* to checks, and specifically something written on the memo line on a check.

###### 3. Application to the present case

The trial court concluded that there was no genuine dispute of material fact that S&S loaned Whitehead money under the line of credit, about the amount of money owed, or that Whitehead defaulted on repaying the loans. Because there was a genuine question of material fact about whether the funds were loans, we reverse.

The promissory note for the line of credit has an effective date of March 2010, with payments set to begin in March 2011. The note matured in March 2020.

After the date of execution in 2010, Whitehead endorsed and deposited dozens of checks from S&S that had "loan" written in the memo line. During the time that he was receiving checks, Whitehead reported on his federal taxes that he was not earning any income. Brautigan testified in his deposition that those checks were intended as loans under the line of credit. This evidence met the initial burden imposed on a party moving for summary judgment to show there is no genuine issue of material fact. CR 56(c).

Whitehead then had the burden to set forth specific facts showing that there was a genuine issue for trial. *Elcon Constr.*, 174 Wn.2d at 169. Whitehead asserted that there was a genuine issue of fact as to whether the checks were compensation for work performed, rather than loans, relying on his own declaration saying he and Brautigan intended the checks to be compensation, as well

as e-mails and texts from Brautigan referring to Whitehead's "income" and "paychecks," and asking for his medical insurance bills. CP at 674. In his declaration, Whitehead also stated it was inconceivable to suggest that he would have worked for free. He emphasized that Brautigan never asked for a payment on the alleged debt and that S&S never issued him tax forms regarding the loan.

The Wrens assume that we can extend the *Hearst* principle that extrinsic evidence cannot be used to contradict the written words of a contract to the memo line of checks. *See Hearst Commc'ns*, 154 Wn.2d at 503. As discussed above, we judicially estop Whitehead from denying that he executed the promissory note for the line of credit in 2010. But the Wrens have provided no Washington authority, nor have we found any, that has extended *Hearst* in precisely the manner requested by the Wrens. In the absence of authority provided by the Wrens to support extending *Hearst*, we consider Whitehead's declaration, and the texts and emails he provided in response to the partial summary judgment motion.

Viewing this evidence in the light most favorable to Whitehead, we conclude that Brautigan's texts and e-mails suggest that the checks could have been payment for work Whitehead performed for S&S. In combination with Whitehead's sworn declaration on the same point, a reasonable jury could have returned a verdict for Whitehead. *Reyes*, 191 Wn.2d at 86. Thus, there is a genuine issue of material fact as to whether the funds were loans and we must remand for a trial on that issue.

We reverse. On remand, the trial court must vacate the judgment and should engage in further proceedings to resolve whether the checks were loans or compensation for work performed. But Whitehead cannot deny that he executed the promissory note for the line of credit in 2010.

## II. INTEREST RATE

Whitehead also argues that the trial court erred by imposing a 36 percent interest rate on the judgment for the line of credit debt. Because we remand for the trial court to vacate the judgment, we decline to address the interest rate argument at this time. The parties may raise this issue again if another judgment is entered in the future.

## ATTORNEY FEES

Whitehead and the Wrens each argue that they are entitled to appellate attorney fees under the promissory note for the line of credit. RAP 18.1(a) allows us to award a party appellate attorney fees where "applicable law" permits. RCW 4.84.330 provides that actions on a contract where the contract "specifically provides that attorneys' fees and costs" incurred to enforce the contract "shall be awarded to one of the parties, the prevailing party . . . shall be entitled to reasonable attorneys' fees." Here, the promissory note requires Whitehead "to pay all costs, expenses and attorney's fees incurred by Holder . . . in any proceeding for the collection of the debt evidenced by this Note" where the holder of the note prevails. CP at 10. But RCW 4.84.330 also defines the "prevailing party" as "the party in whose favor final judgment is rendered." Because there has not been final judgment, neither party is entitled to attorney fees at this time.

## CONCLUSION

We reverse and remand for the trial court to vacate the Wrens' judgment against Whitehead. On remand, Whitehead is judicially estopped from asserting that the line of credit did not exist, or that the promissory note for the line of credit was not executed until 2013. If another judgment is entered in the future, the parties may raise the issue of the correct interest rate before the trial court. Neither party is entitled to attorney fees at this time.

No. 56441-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Maxa, J.

Che, J.