IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ANDREA-MARIE QUEEN,<br><br>               Respondent,<br><br>        v.<br><br>JOSHUA ADAM SHUEMAKE,<br><br>               Appellant. | No. 83864-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Joshua Shuemake appeals a domestic violence protection order (DVPO) protecting Andrea-Marie Queen. Shuemake argues that the evidence is insufficient to support the trial court's finding that he committed domestic violence and that the trial court erred by entering a five-year DVPO. We affirm.

FACTS

In April 2021, Queen petitioned for a DVPO protecting her from Shuemake, whom Queen had been dating on and off for three years. Queen declared under penalty of perjury that on April 12, 2021, Shuemake assaulted her and "punched/backhanded [her and] busted [her] lip." Queen later filed still images from a security camera video showing a fully clothed Shuemake in Queen's bed, holding a pillow over her face. In her petition, Queen declared that although she and Shuemake "have role played during intercourse," when

Citations and pin cites are based on the Westlaw online version of the cited material.

Shuemake was mad "he has gotten extremely violent, strangulation, slappin[g], spanking etc.," and "when [she] ask[s] him to not he continues."

On April 15, 2021, three days after the incident in her bedroom, Queen and Shuemake went to a spa, where they argued and Queen left Shuemake and went home. Queen later declared that early the next morning, Shuemake climbed over Queen's fence and "illegally entered [her] home through [a] doggy door." Queen called 911, and responding officers arrested Shuemake. Queen told an officer about the April 12 bedroom incident, reporting that Shuemake "assaulted her by punching and slapping her several times while the two were on her bed in her bedroom." Queen reported telling Shuemake to stop, and that during the assault, she "could not breathe and was near the point of losing consciousness." Queen filed her DVPO petition the day of Shuemake's arrest.

In response to Queen's petition, Shuemake filed copies of email and text correspondence between himself and Queen that he argued showed that "[t]he events of April 12, 2021 were both planned and consented to by both parties." According to Shuemake, Queen "had been goading a hesitant . . . Shuemake over a significant period of time to engage in rough sex with her." Shuemake asserted that his evidence showed that Queen "was not displeased by the events of April 12; rather, she wanted to engage in these activities again, and planned a birthday celebration on April 16 for [Shuemake]."

In reply, Queen declared that although she and Shuemake had "engaged in sexual fantasy," it "was always very preplanned and discussed ahead of time." She insisted that "[t]he events of April 12, 2021, specifically when [Shuemake]

2

beat, strangled and smothered me with a pillow, were not preplanned nor were they consented to."

The trial court held a hearing on Queen's petition on March 4, 2022. Queen testified that after the April 12, 2021 assault in her bedroom, Shuemake "begged [her] to give him another chance and he was sorry." She testified that Shuemake went "on and on to [her] personally about . . . how his father raised him and he didn't know how to show love." Queen testified,

> . . . I was very compassionate to where, you know what, I do care about him, I love him. Okay, he lost it – you know, because he didn't want me to call the police so he stayed there with me all night. And I felt like the only way I could stop him, and I was able to stop him, was just t[o] give like sex to him after the assault to deescalate him.
> So he stayed that whole night with me worried I was going to call the police. But then that whole night he was so amazing and so wonderful and promised me how he was going to change and do this and do that. So I had agreed to, you know, okay, I'm not going to call the police. Let's just pretend this never happened. Let's just go ahead and move forward. And, you know, that's when I was like, okay, maybe he's serious this time, because we've had this on and off relationship for years, maybe he's serious this time, maybe he realizes he went overstepping the boundary.

When asked why she called the police a few days later, Queen testified that she had "never seen [Shuemake] act so disturbed that he hopped over [her] fence and went in through the door," and she "was scared." She testified that "the last thing in the world [she] wanted to do was to repeat the violence that [they] had on the 12th" and "[t]hat was not a typical sexual event." She described Shuemake's behavior as "crazy behavior," asking, "[W]ho hops over a fence when you could just open it and walk in, you know?"

Queen reiterated that although she and Shuemake, who were in a

3

relationship, did have plans to have sex on April 12, 2021, she did not consent to the assault that occurred. When asked why she continued communicating with Shuemake in the days after the assault, Queen responded,

> Because he had begged me to give him another chance and that he had lost control and that it would never happen again and things would change. And he kept telling me how he, you know, planned on he was moving to Arizona, wanted me to come with him in August, and he made things sound so wonderful like he was going to really change.

At the close of the hearing, the trial court found that it was "more likely than not" that the April 12, 2021 incident in Queen's bedroom constituted domestic violence. The court observed that Shuemake was fully clothed and had a pillow over Queen's face, and that there was evidence that Queen felt like she might lose consciousness based on being suffocated. The court noted that it did not find that Queen's "following through with plans or having communication with . . . Shuemake after the 12th undermines her credibility as to the events on the 12th to the extent that [Shuemake]'s argument is that it should," reasoning, "I just don't think that things are that clear in interpersonal relationships." Although the court denied Queen's request for a permanent protection order, it entered a DVPO with a term of five years.

Shuemake appeals.

## DISCUSSION

### Standard of Review

We review a trial court's decision to grant a DVPO for abuse of discretion. In re Parentage of T.W.J., 193 Wn. App. 1, 6, 367 P.3d 607 (2016). The trial court abuses its discretion when its decision is manifestly unreasonable, or when

4

it exercises its discretion on untenable grounds or for untenable reasons. Id. Where, as here, the trial court has weighed the evidence, we defer to the trial court's determinations regarding the persuasiveness of the evidence, witness credibility, and conflicting testimony. In re Matter of Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014). Our role is simply to determine whether substantial evidence supports the trial court's findings of fact and whether those findings support the conclusions of law. In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

"[S]ubstantial evidence review 'is deferential and requires the court to view the evidence and reasonable inferences in the light most favorable to the party who prevailed below.'" Garza v. Perry, No. 83377-4-I, slip op. at 19-20 (Wash. Ct. App. Jan. 30, 2023) (internal quotation marks omitted) (quoting State v. Living Essentials, LLC, 8 Wn. App. 2d 1, 14, 436 P.3d 857 (2019)), https://www.courts.wa.gov/opinions/pdf/833774.pdf. Evidence is substantial if it is sufficient to persuade a rational and fair-minded person that a premise is true. Nguyen v. City of Seattle, 179 Wn. App. 155, 163, 317 P.3d 518 (2014).

Domestic Violence Finding

Shuemake argues that substantial evidence does not support the trial court's finding that he committed domestic violence. We disagree.

The Domestic Violence Protection Act (DVPA), chapter 26.50 RCW, authorizes the trial court to enter a DVPO based on a determination that domestic violence occurred.[1] See RCW 26.50.030 (DVPO exists for protection

---

[1] The legislature repealed the DVPA effective July 1, 2022 as part of legislation that reorganized various civil protection order statutes into chapter 7.105 RCW. See

5

"in cases of domestic violence"). "Domestic violence" includes, as relevant here, "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, . . . of one intimate partner by another intimate partner."[2] RCW 26.50.010(3)(a).

Shuemake contends that the evidence was insufficient to support the trial court's domestic violence finding because "[t]he time-stamped email correspondence between the parties proves beyond any doubt that the couple engaged in voluntary, rough sex on April 12." He points out that four days before the incident, while Queen was on vacation in Las Vegas, Shuemake wrote to Queen, "I'm still gonna beat your ass and take what's mine when you get back," and Queen responded, "I can't wait!!!!" He also points out that in the same email thread, Queen wrote that she wanted Shuemake to "torture [her] sexually. In a good manner of course." And, he points out that the day after the April 12 incident, Shuemake wrote to Queen, "I've been thinkin about what you did to me yesterday evening all morning," and Queen responded, "Me too. I love my baby Joshi I love you all the time. I really do!!!!!"[3]

---

LAWS OF 2021, ch. 215, § 170(94)-(126). Because that legislation was not yet in effect at the time of the proceedings below, we refer herein to the relevant, but since repealed, DVPA statutes as if still in effect.

[2] Shuemake does not dispute that he and Queen were "intimate partners" as defined by the DVPA.

[3] Shuemake's statement of facts refers to additional correspondence between the parties that he does not cite to again in the argument section of his brief. In analyzing Shuemake's sufficiency challenge, our focus is on the parts of the record to which Shuemake refers in support of his argument. See RAP 10.3(a)(6) (providing that the argument section of a brief must contain "references to relevant parts of the record"); cf. In re Estate of Lint, 135 Wn.2d 518, 532, 957 P.2d 755 (1998) (court will not assume obligation to comb the record for evidence to support counsel's arguments). That said, the additional correspondence described in Shuemake's statement of facts would not change our analysis in light of the relevant standard of review.

But Queen's declarations, sworn testimony, reports to police, and security camera stills, described above, constituted substantial evidence that on April 12, 2021, Shuemake assaulted her and inflicted fear of imminent physical harm by striking her and suffocating her with a pillow to the point she thought she would lose consciousness.[4] They also constituted substantial evidence that even though she and Shuemake had engaged in sexual fantasy before—and perhaps even after—the April 12 assault, that assault was not part of a typical sexual encounter, was not consensual, and continued even after Queen told Shuemake to stop. While Shuemake argues that we should reach a different conclusion based on the parties' correspondence, that argument asks us to reweigh the evidence and second-guess the trial court's credibility determinations, which we will not do. See In re Interest of Pawling, 101 Wn.2d 392, 401, 679 P.2d 916 (1984) ("We are not allowed to second guess the trial court—'to weigh either the evidence or the credibility of witnesses even though we may disagree.'" (quoting In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973))).

Moreover, contrary to Shuemake's assertions, reasonable minds can differ about what inferences to draw from the parties' correspondence, which, as the

---

[4] Although the trial court did not rely on it and did not need to, we observe that an officer who viewed the video from Queen's bedroom reported that Shuemake could be "seen hitting [Queen] and slapping her throughout the video and at approximately 24 seconds in on the video he can be seen suffocating her with a pillow and at approximately 27 seconds in the video he can be seen grabbing the pillow again and covering her head and face while leaning forward and applying his full weight." The officer also stated that after Shuemake removed the pillow, he "again began slapping at [Queen's] face and punching her left side" and was later "seen reaching down and grabbing her throat with both hands and . . . squeezing her throat while moving forward onto his right knee and pushing down with his entire body." And, the officer stated that "[d]uring the assault, [Queen] could be seen constantly attempting to protect her face with her arms and hands."

trial court observed, appeared to be a "kind of playful banter in relation to their sex life." To this end, while Shuemake asserts that Queen "did not challenge or even attempt to clarify the written record," that is not true. Queen declared that to the extent she and Shuemake engaged in a sexual fantasy, that fantasy "did not include [Shuemake] taking full swings at [her] head and face, nor did it involve him smothering [her] with a pillow and restricting [her] airflow." Queen also testified that she had sex with Shuemake after the assault to placate him, and that given how sorry Shuemake seemed to be, she agreed to "just pretend this never happened" and "just go ahead and move forward." A reasonable inference from Queen's testimony is that she corresponded positively with Shuemake after the assault not because the assault did not occur but, instead, because Queen desired to smooth things over. That Shuemake has offered an alternative inference from the parties' correspondence does not mean that the evidence was insufficient to support the trial court's finding that Shuemake's behavior on April 12, 2021 constituted domestic violence. See Freeburg v. City of Seattle, 71 Wn. App. 367, 372, 859 P.2d 610 (1993) (in substantial evidence review, appellate court accepts the factfinder's view regarding the weight to be given reasonable but competing inferences). And while Shuemake points out that Queen did not introduce any documentary evidence of her physical injuries, even he acknowledges that such evidence is not required. Cf. Cavanaugh v. Brewington, 3 Wn. App. 757, 758, 477 P.2d 644 (1970) (testimony alone, if believed, is substantial evidence to support a trial court's findings of fact). Shuemake's sufficiency challenge fails.

8

DVPO Term

Shuemake next argues that even if the evidence supports entry of a DVPO, the trial court erred by entering a DVPO with a term longer than one year. We disagree.

Shuemake asserts that "[t]o warrant an order longer than one year, the superior court must have found that 'the respondent is likely to resume domestic violence against the petitioner . . . when the order expires.'" In support, he relies on RCW 26.50.060(2), which provides, "[I]f the petitioner has petitioned for relief on his or her own behalf . . . and the court finds that the respondent is likely to resume acts of domestic violence against the petitioner . . . when the order expires, the court may either grant relief for a fixed period or enter a permanent order of protection."

Even assuming that the statute requires the court to make this additional finding to justify a five-year protection order (as distinct from a permanent protection order),[5] the trial court here expressly found "based on the severity of the [April 12, 2021] incident" and the likelihood that "related litigation will continue for some time," that "*an order of one year or less will be insufficient to prevent further acts of domestic violence*." (Emphasis added.) While not worded exactly

---

[5] Cf. In re Freeman, 146 Wn. App. 250, 254, 192 P.3d 369 (2008) ("After notice and hearing, *an order of protection can be made permanent* 'if . . . the court finds that the respondent is likely to resume acts of domestic violence against the petitioner or the petitioner's family or household members or minor children when the order expires' on other terms." (emphasis added) (quoting RCW 26.50.060(2))); Hecker v. Cortinas, 110 Wn. App. 865, 869, 43 P.3d 50 (2002) ("If the court finds that the respondent 'is likely to resume acts of domestic violence against the petitioner . . . when the order expires,' *the court has discretion to enter a permanent order of protection*." (emphasis added) (quoting RCW 26.50.060(2))).

as the set forth in the statute, the necessary implication of the trial court's finding is that if the order were to last only one year, Shuemake would be likely to resume acts of domestic violence upon its expiration. Furthermore, Shuemake does not assign error to the trial court's finding, and thus, it is a verity on appeal. See Martin v. Smith, 192 Wn. App. 527, 532, 368 P.3d 227 (2016) ("[U]nchallenged findings are verities on appeal."). The trial court's unchallenged finding was a tenable basis for entering a five-year, rather than a one-year, DVPO.

Shuemake also points out that the trial court found that only the April 12, 2021 incident constituted domestic violence and its "assessment [was] not that there was a long-standing pattern of power and control." However, he cites no authority for the proposition that it is an abuse of discretion for the trial court to order a five-year order either (1) based on the severity of a single instance of domestic violence or (2) in the absence of a finding of a long-standing pattern of power and control.

Shuemake does not persuade us that the trial court abused its discretion by entering a five-year order.

## Fees on Appeal

Queen requests fees on appeal.[6] "We will award attorney fees to the prevailing party 'only on the basis of a private agreement, a statute, or a recognized ground of equity.'" Buck Mountain Owner's Ass'n v. Prestwich, 174 Wn. App. 702, 731, 308 P.3d 644 (2013) (quoting Equitable Life Leasing Corp. v.

_____

[6] Queen also requests an award of costs. That request should be directed to the commissioner or court clerk in accordance with RAP Title 14.

Cedarbrook, Inc., 52 Wn. App. 497, 506, 761 P.2d 77 (1988)).

Queen relies on RCW 26.50.060(1)(g), which authorizes a court in a protection order proceeding to "[r]equire the respondent . . . to reimburse the petitioner for costs incurred in bringing the action, including reasonable attorneys' fees." She points out that she was awarded fees under that statute by the trial court,[7] and argues that she is thus entitled to fees on appeal. Shuemake, who did not file a reply brief, has not opposed Queen's request for fees. We exercise our discretion to grant Queen reasonable attorney fees on appeal, subject to her compliance with RAP 18.1. Cf. Aiken v. Aiken, 187 Wn.2d 491, 506, 387 P.3d 680 (2017) ("If attorney fees are allowable at trial, the prevailing party may recover fees on appeal."); In re Gourley, 124 Wn. App. 52, 59, 98 P.3d 816 (2004) (exercising discretion to grant attorney fees under RCW 26.50.060(1)(g) to respondent who prevailed in appeal from DVPO).

We affirm.

_____
Coburn, J.

WE CONCUR:

_____        _____
Bowman, J.                      Dwyer, J.

---

[7] Shuemake assigns error to the attorney fee award, but he fails to support that assignment of error with argument or citations to authority. Therefore, we do not consider whether the trial court erred by awarding Queen her attorney fees below. See RAP 10.3(a)(6) (requiring appellant's brief to include "argument in support of the issues presented for review"); see also Smith v. King, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986) (assignment of error is waived if unsupported by argument or authority).